*Clark v. Hanley*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2022

(Argued: June 7, 2023       Decided: December 20, 2023)

No. 22-302

_____

VERONICA-MAY CLARK,

*Plaintiff-Appellant,*

-v.-

THOMAS HANLEY, KEVIN MANLEY, PETER MURPHY, KIMBERLY WEIR, ROBERTO QUIROS, AND JANE AND JOHN DOES 1-9,

*Defendants-Appellees.**

_____

Before:       LIVINGSTON, *Chief Judge*, CHIN and KAHN, *Circuit Judges*.

Plaintiff-Appellant Veronica-May Clark, an incarcerated transgender woman, was serially sexually assaulted by Defendant-Appellee Thomas Hanley, a corrections officer at the prison facility in which she was housed. More than seven years after this abuse, Clark brought a civil rights action against Hanley and

_____

* The Clerk of Court is respectfully directed to amend the caption to conform to the above.

1

other corrections officers, seeking equitable tolling of the applicable statute of limitations due to the paralyzing effects of the abuse. After convening an evidentiary hearing on the issue of equitable tolling, the United States District Court for the District of Connecticut (Meyer, *J.*) denied Clark's claim for equitable tolling and dismissed her case as untimely. Clark appeals from the district court's judgment of dismissal, asserting that the court embarked on an impermissible factfinding expedition at the pleading stage of the case by eliciting her testimony at the evidentiary hearing and violated her Seventh Amendment rights by making factual determinations properly reserved for the jury. Because the district court employed proper procedures to resolve Clark's equitable tolling claim and did not make any factual findings that infringe the Seventh Amendment, we **AFFIRM**.

Judge Chin dissents in a separate opinion.

| | |
|---|---|
| FOR PLAINTIFF-APPELLANT: | ALEXANDRA BURSAK (Andrew D. Silverman, Jennifer M. Keighley, *on the brief*), Orrick, Herrington & Sutcliffe LLP, New York, NY. |
| | (Sasha Buchert and Richard Saenz, Lambda Legal, Washington D.C. and New York, NY, *for* Lambda Legal Defense and Education Fund, Inc., The Amicus Project at UConn Law, Just Detention International, and Center for Constitutional Rights, as *amici curiae*) |
| | (Richard Luedeman, Assistant Clinical Professor of Law, UConn School of Law, Hartford, CT, *for* Amicus Project at UConn Law, as *amicus curiae*) |
| FOR DEFENDANTS-APPELLEES: | STUART M. KATZ (Wilson T. Carroll, *on the brief*), Cohen and Wolf, P.C., Bridgeport, CT, *on behalf of* Defendant-Appellee Thomas Hanley. |

ZENOBIA G. GRAHAM-DAYS, Assistant Attorney General, *for* William Tong, Attorney General, Connecticut Office of the Attorney General, Hartford, CT, *on behalf of* Defendants-Appellees Kevin Manley, Peter Murphy, Kimberly Weir, Roberto Quiros, Jane and John Does 1-9.

DEBRA ANN LIVINGSTON, *Chief Judge*:

During the summer of 2011, Plaintiff-Appellant Veronica-May Clark ("Clark"), an incarcerated transgender woman serving a 75-year term of imprisonment for murder, assault, and burglary, was repeatedly sexually assaulted by Defendant-Appellee Thomas Hanley ("Hanley"), a corrections officer at the Connecticut prison facility where Clark was then housed.[1]  Clark initiated the present action in the fall of 2018—more than seven years after Hanley's abuse—asserting federal civil rights claims under 42 U.S.C. § 1983 for violation of her Eighth Amendment rights, along with tort claims under Connecticut law. Conceding that she filed this action more than four years beyond the applicable statute of limitations, Clark asserts that the trauma she suffered in 2011 and her

---

[1] At the time this action was filed, the plaintiff's name was Nicholas Clark.  The district court granted Clark's motion to amend the case caption to reflect her name change in December 2021.

3

fear of retaliation from corrections staff, aggravated by her then-undisclosed gender dysphoria, constitute extraordinary circumstances that prevented her from taking timely steps to file this action against Hanley and other allegedly acquiescent corrections officers (together, the "Defendants"). Clark seeks equitable tolling of the statute of limitations.

Based primarily on its assessment of Clark's testimony at an evidentiary hearing, the United States District Court for the District of Connecticut (Meyer, *J.*) denied Clark's equitable tolling claim and dismissed her suit as untimely.[2] The court concluded that portions of Clark's testimony, which focused on the circumstances that allegedly hampered her from timely filing, were not credible, and that Clark's asserted bases for equitable tolling were, in large part, a *post hoc* rationalization to buttress her equitable tolling claim.[3]

---

[2] The district court initially dismissed Clark's *pro se* complaint *sua sponte* under the three-year statute of limitations applicable to § 1983 claims. Clark, still proceeding *pro se*, appealed, moving "to extend the statute of limitations." App'x 104. A motions panel of this Court, construing Clark's motion as a request for an extension of time to move for reconsideration in the district court, remanded, suggesting that the district court consider appointing counsel in reassessing the timeliness question. *Pro bono* counsel was then appointed and has represented Clark since, both at the evidentiary hearing and on appeal.

[3] Clark does not challenge on this appeal the dismissal of her state law claims and has thus abandoned them. *See Town of Southold v. Wheeler*, 48 F.4th 67, 71 n.2 (2d Cir.

4

On appeal, Clark contends that the district court engaged in impermissible factfinding at the pleading stage and resolved contested issues of fact bearing on the merits of her legal claims in violation of the Seventh Amendment. Clark further argues that the record adduced at the evidentiary hearing entitles her to equitable tolling as a matter of law. These arguments lack merit.

As set forth below, we have repeatedly approved—sometimes even required—evidentiary hearings to resolve equitable tolling claims. Relatedly, equitable tolling is an issue that is generally appropriate for a court, rather than a jury, to resolve, so long as the court's factual findings do not deprive plaintiffs of their Seventh Amendment right to a jury trial on any legal claims.

Here, the district court did not err by holding an evidentiary hearing and gauging the credibility of Clark's testimony in concluding that she was not entitled to equitable tolling. And because the court's factual findings relate squarely to her equitable tolling claim, without intruding upon the merits of her legal claims, the court did not flout Clark's Seventh Amendment rights. Nor was it an abuse

2022). In any event, Connecticut law provides that the three-year limitations period applicable to her state-law claims is a statute of repose that is not susceptible to equitable tolling. *See Gerena v. Korb*, 617 F.3d 197, 206 (2d Cir. 2010).

5

of discretion for the district court to hold on the record before it that Clark failed to carry her burden to show circumstances that warrant equitable tolling. Accordingly, we affirm the district court's judgment of dismissal.

## BACKGROUND

### I. Factual Background[4]

#### A. Hanley's Sexual Assault of Clark

In November 2007, Clark was incarcerated at the MacDougall-Walker Correctional Institution ("MacDougall-Walker") in Suffield, Connecticut, where she was serving a 75-year term of imprisonment based on her conviction earlier that year, pursuant to a guilty plea, on charges of murder, assault, and burglary. Based on her prior experience as an electrician, the facility assigned Clark to assist with various electrical projects in the facility's general maintenance department, placing her under the supervision of Hanley, MacDougall-Walker's General Maintenance Officer.

---

[4] The facts concerning the events that form the basis of Clark's legal claims are drawn from the allegations in the Second Amended Complaint and are accepted as true at this stage of the proceedings. *See Kane v. Mount Pleasant Cent. Sch. Dist.*, 80 F.4th 101, 104 n.1 (2d Cir. 2023). Additional facts concerning the circumstances surrounding Clark's commencement of this action are sourced from materials extraneous to the pleadings, which, as explained *infra* Discussion Section I.A, we consider only as pertinent to the issue of equitable tolling.

6

As set forth in the Second Amended Complaint, Hanley was running a smuggling ring at MacDougall-Walker at the time, supplying inmates with contraband, such as illegal narcotics and alcohol, in exchange for payment. Tipped off to Hanley's illicit scheme, the Connecticut Department of Correction ("DOC") initiated a formal investigation into Hanley in 2010 that uncovered not only his smuggling activities, but also his pattern of propositioning inmates with sexual behavior. Clark alleges that several high-ranking officials at MacDougall-Walker—including Defendants-Appellees Warden Peter Murphy, Director of Security Kimberly Weir, and Intelligence and Security Unit Captains Kevin Manley ("Manley"), and Roberto Quiros (collectively, the "MacDougall-Walker Defendants")—knew of Hanley's abusive tendencies yet did nothing to address them. Clark further contends that MacDougall-Walker maintained policies that facilitated her abuse by allowing Hanley and other staff to isolate inmates from the general prison population free from oversight and outside the purview of any video surveillance or inmate tracking systems.

On at least five occasions spanning the spring and summer of 2011, Hanley sexually assaulted Clark, leveraging his authority to coerce her into performing sexual acts. Hanley's initial physical encounter with Clark occurred in April

7

2011 and escalated over the ensuing days and weeks to include oral sex on one occasion and mutual masturbation on four occasions. Typically, Hanley would isolate Clark from other inmates under the pretext of needing assistance on a maintenance project. According to Clark, none of the incidents involved the use of physical force or threats of force: "Hanley did not threaten me to perform any sexual acts but said he would take [care] of me by feeding me well. I kind of felt obligated into engaging in the sexual acts with Hanley." App'x 139. The assaults occurred outside the view of security cameras.

Apprised of his conduct, the DOC placed Hanley on leave in August 2011, and he resigned shortly thereafter. Hanley was arrested in connection with his assaults on Clark in December 2011 and eventually pleaded guilty to three counts of sexual assault in the fourth degree.

## B. The Aftermath of the Assaults

The Second Amended Complaint sets forth Clark's claims regarding the aftermath of the assaults in fourteen paragraphs. Clark alleges that the string of sexual assaults "deeply and profoundly scarred" her, making it "difficult for her to carry out ordinary functions, let alone process her assaults and attempt to secure justice while incarcerated." App'x 123. She was initially reluctant to participate

8

in the DOC's investigation of Hanley but in August 2011 provided Connecticut state police with a statement detailing Hanley's sexual assaults.[5] Clark requested transfer to another facility.

The DOC first transferred Clark from MacDougall-Walker to Corrigan Correctional Center ("Corrigan") around September 2011. Clark alleges that she suffered physical and mental abuse at the hands of a cellmate at Corrigan, causing her to initiate a hunger strike to bring about transfer to another facility. The DOC transferred Clark in early 2012, but back to MacDougall-Walker, further stoking her trauma. Clark alleges that on her return to MacDougall-Walker, corrections officers taunted her for being the victim of Hanley's sex crimes and told her she was "gross," "nasty," and "disgusting." Clark again went on hunger strike and told one of her physicians that she would kill herself if she were not transferred out of MacDougall-Walker. She was then transferred to the Garner Correctional Facility ("Garner"), an inpatient psychiatric facility, where she "was placed on suicide watch and carefully evaluated." App'x 124. About two weeks later, still

---

[5] Appended to the Second Amended Complaint is an affidavit of Connecticut State Police Trooper Paul DaCruz ("DaCruz"), in support of an application for an arrest warrant of Hanley, which describes Hanley's assaults of Clark in detail.

9

in early 2012, she was discharged from the inpatient facility and transferred to the Cheshire Correctional Institution ("Cheshire"), where she remained for the next four and a half years, until mid-2016.

The Second Amended Complaint alleges, without specification as to the dates or frequency of such events, that Clark encountered corrections officers at Cheshire who were at MacDougall-Walker around the time of the assaults in 2011, and that inmates at Cheshire openly mocked and diminished the abuse she suffered at the hands of Hanley as "gay stuff." App'x 124. Clark also alleges that Cheshire officials repeatedly denied her treatment for gender dysphoria, resulting in a crisis in July 2016 when she attempted to castrate herself with a pair of nail clippers.[6] Clark alleges that she received outpatient treatment at a medical facility in the aftermath of this incident and was then sent briefly to the infirmary at MacDougall-Walker, where she was hospitalized and declared to be an ongoing self-harm risk. Later in 2016, she was transferred back to Garner, where she

---

[6] Clark has a pending Eighth Amendment action against the DOC related to its alleged failure to provide her transitional medical care. *See Clark v. Quiros*, No. 19 Civ. 575 (VLB) (D. Conn.).

remained at the time she filed suit in 2018. In 2020, Clarke returned first to MacDougall-Walker and then to Cheshire, where she is currently housed.

## II. Procedural Background

### A. Filing the Instant Suit and Clark's First Appeal

Clark commenced this lawsuit by filing a *pro se* complaint in October 2018, over seven years after Hanley's abuse. In January 2019, before the Defendants appeared in the case, the district court *sua sponte* dismissed Clark's suit as untimely under the three-year statute of limitations applicable to her § 1983 claims. *See Clark v. Hanley*, No. 18 Civ. 1765 (JAM), 2019 WL 319398 (D. Conn. Jan. 23, 2019). Clark, still proceeding *pro se*, appealed the district court's dismissal and filed a motion to extend the statute of limitations. *See Clark v. Hanley*, No. 19-502, Dkt. No. 14 (2d Cir. 2019). She argued in her motion that the statute of limitations should be tolled because she "lived in absolute terror of filing this lawsuit" after what happened with Hanley. App'x 22.

A motions panel of this Court concluded that Clark should have the opportunity to present her equitable tolling arguments, on the general principle that "a district court should not sua sponte dismiss a complaint as untimely without first granting a litigant notice and an opportunity to be heard." App'x

11

104 (citing *Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007)). We thus remanded the case to allow Clark to move before the district court for reconsideration of the dismissal of her complaint, at the same time suggesting that the district court consider the appointment of *pro bono* counsel.

## B.     The Proceedings on Remand

On remand, now with the assistance of *pro bono* counsel, Clark filed an amended complaint to detail Hanley's pattern of sexual assault, the institutional failures that allegedly enabled the abuse, and the abuse-related trauma she suffered. The Second Amended Complaint, which is the operative pleading, asserts two claims under 42 U.S.C. § 1983 for violation of Clark's Eighth Amendment rights—one against Hanley for sexually assaulting her and the other against the MacDougall-Walker Defendants for being deliberately indifferent to abusive conditions of confinement—and three claims under Connecticut state law for intentional infliction of emotional distress, recklessness, and intentional sexual assault.[7] As relevant to her equitable tolling argument, the Second Amended

---

[7] Soon after filing the First Amended Complaint, Clark sought leave to amend her pleadings to replace defendant Angel Quiros, who had been erroneously identified as working at MacDougall-Walker, with Roberto Quiros, a Captain in MacDougall-Walker's Intelligence Security Unit. *See Clark v. Hanley*, No. 18 Civ. 1765 (JAM) (D. Conn.)

12

Complaint alleges that Clark was "not in a position to seek justice any earlier than when she did" due to the impact of the sexual assaults, her fragile mental state, and mistreatment by prison officials and inmates during the years after the assault. App'x 123–25.

Hanley and the MacDougall-Walker Defendants each filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Clark's claims were time-barred. The Defendants argued that, even as supplemented by her amended pleadings, Clark failed to show extraordinary circumstances and appropriate diligence so as to warrant equitable tolling. The Defendants emphasized that the Second Amended Complaint does not allege any attempt by Clark to file this action between 2011 and 2018, despite her demonstrated capacity to commence legal proceedings during this period, as evidenced by a habeas petition she prepared in November 2011.[8] Clark argued in opposition that her

_____

("District Court Docket"), Dkt. No. 45. The First and Second Amended Complaints are otherwise identical. *See* District Court Docket No. 45-11.

[8] Clark alleged in her habeas petition that her attorney in the criminal case "failed to engage meaningfully in plea bargaining and to adequately inform the petitioner of the terms of the plea offer in a timely manner." App'x 278. As a result, she claimed she was "unjustly coerced into entering a guilty plea without [her] counsel having meaningfully explained the terms of any sentence that would be imposed" after pleading guilty. *Id.* Clark withdrew the petition on February 10, 2023. *See Nicholas Clark NKA Veronica-May Elizabeth Clark #355139 v. Warden*, TSR-CV12-4004677 (Conn. Super. Ct.).

circumstances warranted equitable tolling and that resolution of this fact-laden issue was premature at the pleading stage.

The court heard oral argument on the Defendants' motions to dismiss and proposed holding a hearing to assess Clark's claim for equitable tolling. Clark's counsel noted that he had an "issue" with the proposal because equitable tolling is "a factually intense question," A557-58, and he had not yet received sought-after discovery relating to Clark's prison medical records, the assault circumstances, and retaliation by other prison officials. A560. Clark's counsel did not object to the idea of a limited evidentiary hearing but stated "I would just be a little bit concerned, Your Honor, if there were an evidentiary hearing . . . that cabined the inquiry on the exceptional circumstances to just sort of a very narrow aspect of it without giving us the benefit of fully exploring those issues." App'x 566. Counsel requested that "[i]f the Court is inclined to consider an evidentiary hearing," the Defendants should be ordered to provide the requested discovery. App'x 570-71.

Ultimately, the court decided "to conduct an evidentiary hearing to decide if Clark can sustain her burden to establish grounds for equitable tolling." SPA1. The district court provided that Clark's full medical file should be provided to the

14

plaintiff, along with the "already requested discovery," and that "the hearing should be limited to the testimony of Clark and to . . . any exhibits or documents that are not presently in the record and that any party wishes the Court to consider that bear on the issue of equitable tolling." App'x 578, SPA2. In accordance with this instruction, the parties submitted a list of exhibits, which included, among other things, a selection of Clark's medical records and filings made in Clark's habeas case.

## C. The Evidentiary Hearing

The district court held the evidentiary hearing on September 20, 2021, which consisted of direct and cross examinations of Clark, questioning by the court, and oral argument from counsel. Clark admitted that she failed to take even preliminary steps to commence suit until 2016, notwithstanding that she both provided a detailed account of the crimes to Connecticut police in November 2011 and, during the same month, pursued habeas relief based on the claim that her attorney rendered ineffective assistance of counsel in her criminal case. In broad strokes, Clark described two, interrelated reasons for her inability to file this civil case within the limitations period: (1) her fear that bringing suit against Hanley and other high-level DOC officials would invite retaliation from corrections staff,

15

as evidenced by their ridiculing her as a victim of sexual assault; and (2) the severe psychological trauma she suffered related to the abuse, which aggravated her gender dysphoria and heightened her fear of coming out as transgender in prison. She argued that the statute of limitations should be equitably tolled until at least October 2015—three years before she filed her complaint.

On her fear of retaliation, Clark repeatedly testified that she feared DOC personnel would retaliate against her for filing this lawsuit.[9]  *See, e.g.*, App'x 360 ("I was afraid of the COs and the staff and retaliation for filing the lawsuit"). Clark could not point to any specific threat of retaliation by DOC personnel, but she sourced her fear to the repeated name-calling and ridicule she testified to having experienced in the aftermath of the assaults.  *See, e.g.*, App'x 375 ("[I]n the unit they would call me disgusting.   And fag[g]ot.   And they would laugh at me because of what happened.").   She feared this derision would escalate if she filed suit.  *See, e.g.*, App'x 478 ("I thought . . . the abuse would become worse to the point of physical violence, and also that they would come into my cell and just tear

---

[9] Clark claimed she was reluctant even to provide her statement to the Connecticut police, and that investigators pressured her to do so.   In contrast, in his affidavit in support of an application for an arrest warrant for Hanley, DaCruz affirmed that Clark had requested to speak to a state trooper in order to file her complaint.   Clark denied this ever took place.

16

it up every chance they got and just make my life a nightmare[.]").  Extensive

medical records introduced at the hearing, however, do not reflect that Clark ever

informed any prison mental health worker of these concerns, nor did she testify to

reporting the alleged insults to anyone else.

As to her mental health struggles, Clark explained that she suffered from

depression and suicidal ideation at various points during the relevant period,

which conditions were heightened when she re-encountered corrections officers

from MacDougall-Walker, whom she associated with the abuse.  *See, e.g.*, App'x

387 (describing her encounters with such officers as "awful," "terrible," and

causing "really high anxiety").  Clark testified that she was too traumatized to

file suit while incarcerated at Cheshire from early 2012 until the middle of 2016.

Clark's extensive medical records, however, reflect that by December 2012 she was

reporting to medical personnel at Cheshire that she was "doing fine," experiencing

no major distress, and was both writing poetry and looking forward to

participating in the facility's writing group.[10]   App'x 604.   Clark testified that the

---

[10] In another notation dated April 2013, Clark is reported to have denied any psychiatric distress and to be "future oriented."  App'x 604.  Clark was again seen in December 2013 when prison officials became concerned at her sudden unwillingness to work in the facility's sign shop.  She did report being depressed at that time but was

17

only reason her mental health records suggest she was improving during this period was because she had decided to stop being forthright with the DOC mental health staff. She produced no medical records at all for 2014 and 2015 but explained that she avoided seeking mental health treatment during this period because she did not trust the mental health personnel.

Clark testified that there came a point in April 2016 when she first admitted to and sought medical treatment for her gender dysphoria, while still at Cheshire. She experienced "at least some mental health improvement" at that time but was denied treatment, which was "horrible," "really stressful," and resulted in her attempt at self-castration.[11] App'x 391–96. Clark testified that she was only able to take steps to bring suit later that year, when she was transferred to Garner,

---

noted to be cooperative and future oriented, if "very indignant about being found guilty of murder and having been sentenced to 75 years." App'x 606. Clark explained that she was no longer willing to work in the sign shop because "[i]t's immoral to make us work for less than minimum wage and to sell our goods for money." App'x 606. When asked about this statement by the district court, Clark testified that she had been reading Ayn Rand at the time.

[11] Clark testified that she feared coming out as transgender earlier because she thought it would leave her vulnerable to abuse. *See, e.g.*, App'x 453 ("One of the huge things about not filing the lawsuit was my gender issues. Like, I felt that it would come out that I was trans, you know. And that was like really, really scary for me."); App'x 481 ("I just thought . . . I would be raped all the time [if I came out as transgender in prison]. And beat up. Or killed. You know, just terrible things would happen to me . . . .").

18

began receiving treatment for her gender dysphoria, and "felt safer." App'x 401. Yet, she also admitted requesting her most recent transfer back to Cheshire, where she had allegedly suffered mistreatment, explaining, among other reasons, that "there's way more stuff at Cheshire like programs and so on and so forth." App'x 402.

As to her state habeas petition, Clark initially claimed that her fear of retaliation and mental health issues did not inhibit her from working on it in November 2011, only a few months after the assaults, because it had "nothing to do with the DOC at all." App'x 403–04. She added on direct examination that after she filed the petition, counsel was assigned and she devoted no significant amount of time to the matter. On questioning from the district court, however, Clark claimed for the first time that her cellmate at Corrigan, where she was incarcerated in November 2011, had in fact pressured her into preparing and filing the petition: "[H]e prided himself on being a legal scholar, in his words. . . . I was terrified of this guy. . . . [H]e kind of like made me file this. I didn't want to file it." App'x 469–70. Despite claiming that her cellmate had forced her to bring the habeas petition, however, Clark also testified that she is "happy" it was filed. App'x 472.

19

### D. The Dismissal Order

Following the evidentiary hearing, the district court dismissed Clark's Second Amended Complaint, deeming her claims barred by the applicable three-year statute of limitations because she failed to demonstrate extraordinary circumstances caused her tardy filing so as to warrant equitable tolling. *See Clark v. Hanley*, No. 18 Civ. 1765 (JAM), 2022 WL 124298 (D. Conn. Jan. 13, 2022). The district court concluded that neither of Clark's stated reasons for failing timely to bring suit—her alleged fear of retaliation or the trauma from Hanley's abuse, as aggravated by Clark's gender dysphoria—caused her years-long delay in bringing this action. Accordingly, the court concluded that Clark was not entitled to equitable tolling and that her suit was time-barred. *See id.* at *4–9.

The district court first rejected Clark's argument that concerns about retaliation prevented her from filing this action within the limitations period. *See id.* at *4–5. Clark was unable to recount any actual threat of retaliation from any prison official, but attributed her fears to the anguish she felt when officers allegedly insulted her or belittled the abuse she suffered. *Id.* Clark, however, never filed any reports about such insults or mentioned them during her extensive interactions with prison mental health officials. *Id.* at *5. The court found that

Clark's testimony "that she actually feared retaliation if she filed this lawsuit was not credible." *Id.* at *6.

Turning to her second rationale, the district court recognized that Clark suffered from serious depression and gender dysphoria during the period at issue, at times to the point of self-harm. The court nevertheless concluded that the evidence did not establish a causal link between Clark's mental state and the delay in filing this lawsuit nor show that she exercised reasonable diligence in pursuing her rights. *See id.* The court saw reason to doubt Clark's claim that the abuse "was of such a nature that [she] could not bring herself to talk about the incidents or file a court action," because soon after the abuse she provided a detailed account of the events to a Connecticut state trooper.[12] *Id.* The court also considered Clark's *pro se* habeas petition to "strongly weigh[ ] against" her contention that she "was so psychologically immobilized that she lacked the ability . . . to file a federal civil rights complaint to seek relief for Hanley's sexual abuse."[13] *Id.* at *7. The

---

[12] The district court rejected as not credible Clark's testimony denying that she ever made a request to speak to a trooper in order to file a complaint.

[13] The district court noted that Clark "tried to blame her filing of the habeas corpus petition on an unnamed cellmate," but rejected this aspect of her testimony as "neither plausible nor credible." *Clark*, 2022 WL 124298, at *7.

21

court found it significant that while Clark's medical records reflect many concerns about various issues in her life—that she missed her children, was frustrated with the legal system, her ex-wife, and the charges against her—conspicuously absent is any mention of trauma preventing her from filing suit. *Id.* at *7–8. "To the contrary," the court noted, these records "show Clark's willingness to advocate for herself in prison by going on a hunger strike, writing a complaint to the warden, and protesting prison labor conditions . . . ." *Id*. at *8.

As to Clark's claim that she was only able to file suit after her transfer to Garner in July 2016 and her treatment there for gender dysphoria, the court noted that "[a]lthough Clark's burden is to prove that the limitations period should be tolled through October 2015, she has not introduced any medical records at all for 2014 or 2015." *Id*. The court rejected Clark's reliance on medical records from dates long after the limitations period had expired, observing that even these later records undercut her case. "There is one medical note from October 2017," the court observed, "stating that Clark is 'focused on habeas appeal at present, objective is to have a trial granted [in] hope of a [lower] sentence (currently doing 75 yrs. on a plea bargain).'" *Id*. The court observed that this note, far from helping Clark carry her burden, "shows that she was able to focus at that time on

22

seeking relief . . . a full year before she got around to filing her federal civil rights action in this case in October 2018." *Id*.

"All in all," the court concluded, Clark "failed to carry her burden to show grounds for equitable tolling." *Id.* at *9. The court acknowledged Clark's "significant mental health issues," but determined that "the evidence does not show that these issues prevented her from timely filing a complaint." *Id*. Her testimony on the critical points relevant to her equitable tolling claim "was not generally credible or persuasive." *Id*. Clark timely appealed.

## STANDARD OF REVIEW

In the ordinary case, "[w]e review a district court's grant of a motion to dismiss the complaint on the pleadings *de novo* and construe the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (internal quotation marks, alterations, and citation omitted).

This appeal, however, comes to us in an unusual posture in that the district court held an evidentiary hearing focused on equitable tolling, an issue over which trial courts possess a degree of factfinding authority. *See Doe v. United States*, 76 F.4th 64, 70 (2d Cir. 2023) ("In general, district courts should 'resolve the factual

23

questions' relevant to the equitable tolling of a statute of limitations, such as those 'surrounding a plaintiff's mental state.'" (quoting *Montin v. Est. of Johnson*, 636 F.3d 409, 414–15 (8th Cir. 2011))); *see also Upadhyay v. Sethi*, 848 F. Supp. 2d 439, 446 (S.D.N.Y. 2012) ("Questions pertaining to matters of equity, including the applicability of equitable tolling to statutes of limitations, are well within the ambit of the Court's authority to resolve."). On review of the record, the district court duly apprised the parties that it would resolve the issue of equitable tolling based on matters outside the pleadings. Indeed, the evidentiary hearing possessed the hallmarks of a bench trial limited to the issue of equitable tolling. Given the nature of these proceedings and the thoroughness of the record before the district court, we review the district court's equitable tolling decision for abuse of discretion, as we ordinarily would from the denial of such a claim that has moved beyond the pleading stage. *See Doe*, 76 F.4th at 70 ("When a district court determines that equitable tolling is inappropriate, we review the legal premises for that conclusion *de novo*, the factual bases for clear error, and the ultimate decision for abuse of discretion." (quoting *DeSuze v. Ammon*, 990 F.3d 264, 268 (2d Cir. 2021))); *accord Phillips v. Generations Fam. Health Ctr.*, 723 F.3d 144, 149 (2d Cir. 2013).

24

Likewise, we review the district court's decision regarding the scope of discovery for abuse of discretion. *See Pippins v. KPMG, LLP*, 759 F.3d 235, 251 (2d Cir. 2014) ("A trial court enjoys wide discretion in its handling of pre-trial discovery, and we will reverse a district court's discovery ruling only upon a clear showing of an abuse of discretion." (internal quotation marks and citation omitted)); *accord Figueroa v. Mazza*, 825 F.3d 89, 99 (2d Cir. 2016). "A district court abuses its discretion only 'when the discovery is so limited as to affect a party's substantial rights.'" *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 103 (2d Cir. 2008) (quoting *Long Island Lighting Co. v. Barbash*, 779 F.2d 793, 795 (2d Cir.1985)).

## DISCUSSION

The parties agree that Connecticut's general three-year statute of limitations for personal injury actions applies to Clark's § 1983 claims asserting violations of her Eighth Amendment rights. *See* Conn. Gen. Stat. § 52-577; *see also Walker v. Jastremski*, 430 F.3d 560, 562 (2d Cir. 2005) (applying Conn. Gen. Stat. § 52-577 to a § 1983 claim). As Clark alleges no contact with Hanley following the date Hanley resigned from his post at MacDougall-Walker, the district court indicated, and we agree, that Clark's claims accrued at the latest by August 2011. *See Barnes v. City of New York*, 68 F.4th 123, 127 (2d Cir. 2023) (explaining that "federal law governs

25

the accrual of [§ 1983] claims [which] typically accrue when the plaintiff knows or has reason to know of the injury which is the basis of [her] action" (internal quotation marks and citation omitted)).   Based on this accrual date, the statute of limitations on Clark's claims expired in August 2014.   She did not commence this action, however, until October 26, 2018, more than four years beyond the limitations period.

In "rare and exceptional circumstances," *Walker*, 430 F.3d at 564 (citation omitted), the statute of limitations governing a § 1983 claim may be subject to equitable tolling, "where necessary to prevent unfairness to a plaintiff who is not at fault for her lateness in filing."[14] *Gonzalez v. Hasty*, 651 F.3d 318, 322 (2d Cir. 2011) (citation omitted).   "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that [s]he has been pursuing [her] rights diligently, and (2) that some extraordinary circumstance stood in [her] way."

_____

[14] The MacDougall-Walker Defendants assert that Conn. Gen. Stat. § 52-577 is a statute of repose (not limitations) to which equitable tolling does not apply.   As already noted, this feature of Connecticut law forecloses any equitable tolling argument that might apply to Clark's state claims.   It is less clear, however, whether this vitiates the possibility of equitable tolling as to her federal claims.   *See Walker*, 430 F.3d at 564 (assuming equitable tolling could apply to § 52-577 when applied to a § 1983 claim).   We need not resolve this question because even assuming *arguendo* that her federal claims are eligible for equitable tolling, we agree with the district court that Clark has not demonstrated her entitlement to tolling of the limitations period.

*Smalls v. Collins*, 10 F.4th 117, 145 (2d Cir. 2021) (citation omitted). "The law prohibits a judge from exercising her discretion where these two elements are missing[,]" but "[i]f they are found to be present . . . then a judge brings discretionary considerations to bear in deciding whether to permit equitable tolling." *Doe*, 76 F.4th at 71.

Clark seeks reversal or, in the alternative, vacatur of the district court's denial of her equitable tolling claim. At the outset, Clark contends it was inappropriate for the district court to hold an evidentiary hearing on the Defendants' motions to dismiss pursuant to Rule 12(b)(6), in which posture a district court may not rely on matters outside the pleadings or engage in factfinding. And, while a district court may convert a Rule 12(b)(6) motion into one for summary judgment under Rule 12(d), Clark emphasizes that the district court did not purport to do so here.[15] Clark additionally argues that the district court resolved contested factual issues bearing on the substance of her legal claims, which the Seventh Amendment reserves for the jury. Beyond these procedural

---

[15] In any event, Clark claims that summary judgment is inappropriate on this truncated record, which was limited to her testimony at the evidentiary hearing and the set of documents then available.

errors, Clark insists that the record compels equitable tolling as a matter of law and the district court's ruling to the contrary was infused with legal and factual error.

None of these arguments has merit. The district court did not overstep by holding an evidentiary hearing and resolving Clark's equitable tolling claim based on the evidence adduced therein. Neither did the court transgress the Seventh Amendment by resolving factual issues that relate squarely to her equitable tolling claim. Finally, the district court did not abuse its discretion in finding that Clark was not entitled to equitable tolling based on the record before it. We address each of these arguments in turn.

## I. Claims of Procedural Error

The Federal Rules of Civil Procedure prescribe distinct judicial roles at the pleading, summary judgment, and trial stages of a case. Clark acknowledges that district courts sit in equity on the issue of equitable tolling, which affords them a degree of factfinding authority over the issue. *See Doe*, 76 F.4th at 70. The district court erred here, she argues, by holding an evidentiary hearing on the basis of limited discovery and by resolving disputed issues of fact upon a motion to dismiss. While the Defendants invoked Rule 12(b)(6) in moving to dismiss the

28

Second Amended Complaint, however, the record shows that the litigation had progressed beyond the pleading stage on Clark's equitable tolling claim. The parties were on notice that the district court intended to resolve this claim based on evidence adduced at the hearing and that the evidentiary hearing, as conducted, was the functional equivalent of a bench trial on the equitable tolling issue.[16] In these circumstances, as set forth herein, the district court did not deviate from the applicable procedural rules by holding this evidentiary hearing and using it to resolve contested issues of fact going to Clark's equitable tolling claim.[17]

---

[16] The dissent, but not Clark, contends that the 20 calendar days between the August 2021 order announcing the hearing and the deadline to submit additional materials was too short a time frame to provide Clark a meaningful opportunity to establish the relevant facts. Dissent at 9. That Clark herself has not raised this issue speaks for itself. At any rate, Clark received *pro bono* counsel in October, 2019 and amended her complaint with equitable tolling in mind in November, 2020. We disagree that she was shorted of the time needed to prepare on this issue.

[17] The MacDougall-Walker Defendants argue that Clark failed to preserve any objection to the evidentiary hearing because she sought the opportunity to offer evidence prior to the district court's ruling on the motions to dismiss and she did not object when the court scheduled the hearing. We agree that Clark did not clearly state an objection to proceeding as the district court proposed, but we decline, in this case, to find that she forfeited her challenge, as Clark did apprise the district court of concerns regarding the evidentiary hearing during the pre-motion conference.

## A.    The Procedural Framework for Equitable Tolling

On a motion to dismiss pursuant to Rule 12(b)(6), the district court's task is to assess the pleadings to determine whether they contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.   *See Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53 (2d Cir. 2022).   In performing this exercise, district courts "may review only a narrow universe of materials," which includes "facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, . . . matters of which judicial notice may be taken," as well as "document[s] not expressly incorporated by reference in the complaint [that are] nevertheless 'integral' to the complaint."[18] *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (internal quotation marks, alterations, and citations omitted).

---

[18] Both Hanley and the MacDougall Walker Defendants argue that the district court did not flout the Rule 12(b)(6) standard because the extra-pleading materials it considered were "integral" to her complaint.   This is clearly incorrect.   We have explained that a matter may be deemed "integral" to the complaint "when the complaint relies heavily upon its terms and effect."   *Palin*, 940 F.3d at 811 (internal quotation marks and citation omitted).   But "[h]earing testimony elicited by the trial judge after litigation has already begun is not the type of material that ordinarily has the potential to be a matter 'integral' to a plaintiff's complaint."   *Id.*   The same logic applies to Clark's medical records, which, Clark represents, she did not have access to when drafting the complaint.

Generally speaking, "the lapse of a limitations period is an affirmative defense that a *defendant* must plead and prove." *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 319 (2d Cir. 2021) (emphasis added) (internal quotation marks, citation, and alteration omitted). The pleading requirements of the Federal Rules of Civil Procedure "do not compel a litigant to anticipate potential affirmative defenses, such as the statute of limitations, and to affirmatively plead facts in avoidance of such defenses." *Abbas*, 480 F.3d at 640; *see also* Fed. R. Civ. P. 8(a)(2) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief"). "Nevertheless, a defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Whiteside*, 995 F.3d at 319 (internal quotation marks and citation omitted). A court may dismiss a claim as untimely at the pleading stage "only if" from the face of the complaint "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999) (internal quotation marks and citation omitted).

Related to the pleading rules for affirmative defenses, equitable tolling often raises fact-specific issues premature for resolution on a Rule 12(b)(6) motion,

31

before a plaintiff can develop the factual record. *See, e.g.*, *Brown v. Parkchester S. Condominiums*, 287 F.3d 58, 60–61 (2d Cir. 2002) (vacating dismissal and ordering evidentiary hearing because "[b]ased on the limited record presented to the district court, it appears there may be substance to [the plaintiff's equitable tolling] claim."); *Valverde v. Stinson*, 224 F.3d 129, 135 (2d Cir. 2000) (vacating dismissal and remanding "to develop further the facts" on equitable tolling claim); *see also Lama v. Malik*, 58 F. Supp. 3d 226, 235 (E.D.N.Y. 2014) (collecting cases suggesting that equitable tolling issues are generally not amenable to resolution on a motion to dismiss).[19] We acknowledged as much in vacating the district court's first dismissal of Clark's complaint, affirming the well-established rule that it is generally improper to dismiss a complaint as untimely without first granting a

---

[19] This principle is generally applicable across circuits. *See, e.g.*, *Bernstein v. Maximus Fed. Servs., Inc.*, 63 F.4th 967, 969 (5th Cir. 2023) ("When equitable tolling is raised as a defense to a motion to dismiss, this court assume[s] the pleaded facts as true, and . . . will remand if the plaintiff has pleaded facts that justify equitable tolling." (internal quotation marks and citation omitted)); *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 301-02 (3d Cir. 2010) ("[O]ur Court (and our sister circuit courts) have reasoned that, because the question whether a particular party is eligible for equitable tolling generally requires consideration of evidence beyond the pleadings, such tolling is not generally amenable to resolution on a Rule 12(b)(6) motion."); *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 1003–04 (9th Cir. 2006) ("Generally, the applicability of equitable tolling depends on matters outside the pleadings, so it is rarely appropriate to grant a Rule 12(b)(6) motion to dismiss (where review is limited to the complaint) if equitable tolling is at issue.").

litigant notice and an opportunity to be heard. App'x 104 (citing *Abbas*, 480 F.3d at 640).

If "matters outside the pleadings are presented to and not excluded by the court" on a motion to dismiss, Federal Rule of Civil Procedure 12(d) provides that "the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). In advance of such a conversion, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* We have stressed a functional approach to conversion, emphasizing that "[t]he district court's conversion of a Rule 12(b)(6) motion into one for summary judgment is governed by principles of substance rather than form." *In re G. & A. Books, Inc.*, 770 F.2d 288, 295 (2d Cir. 1985). As such, "[t]he essential inquiry is whether the appellant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings." *Id.*; *see also Hernandez v. Coffey*, 582 F.3d 303, 307 (2d Cir. 2009) ("Ordinarily, formal notice is not required where a party should reasonably have recognized the possibility that the motion might be converted into one for summary judgment [and] was [neither] taken by surprise [nor] deprived of a

33

reasonable opportunity to meet facts outside the pleadings." (internal quotation marks and citation omitted)).

On summary judgment, courts are tasked with determining whether "the movant [has] show[n] that there is no genuine dispute as to any material fact and . . . is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kee v. City of New York*, 12 F.4th 150, 166–67 (2d Cir. 2021) (internal quotation marks and citation omitted). This limited judicial role stems from the precept that, at least as pertaining to a party's legal claims, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021) (internal quotation marks and citation omitted); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

This logic is not altered because district courts may serve as the ultimate factfinder on the issue of equitable tolling. In other words, when a district court "approache[s] the issue of equitable tolling in the prototypical summary judgment

posture"—that is, purporting to "draw[ ] legal conclusions based on purportedly undisputed facts regarding the prerequisite elements to the exercise of equitable tolling"—it is not acting in a factfinding capacity. *Doe*, 76 F.4th at 71. Accordingly, in the equitable tolling context, courts routinely grant summary judgment to defendants where deficiencies in the record establish that the prerequisites of equitable tolling have not been met and deny summary judgment where a reasonable factfinder could conclude otherwise.[20]

When, however, a district court exercises its role as factfinder on an equitable issue such as equitable tolling, we have stated that "a district court generally should conduct an evidentiary hearing before making factual findings if a plaintiff's 'sworn averments of fact, though disputed, meet the legal standards

---

[20] *Compare, e.g.*, *Perez v. Harbor Freight Tools*, 698 F. App'x 627, 629 (2d Cir. 2017) (summary order) (affirming denial of equitable tolling where plaintiff's argument was "belied by the record" and "no reasonable factfinder could have concluded" that the plaintiff was incapacitated to the extent claimed); *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000) (affirming summary judgment for a defendant where a plaintiff offered only a "conclusory and vague claim, without a particularized description" of the circumstances purporting to justify equitable tolling), *with Doe*, 76 F.4th at 71-72 (vacating grant of summary judgment where a factfinder "could reasonably conclude that an extraordinary circumstance stood in [the] way of commencing this case sooner"); *Crosby v. United States*, No. 20 Civ. 330 (SDA), 2021 WL 4805465, at *2 (S.D.N.Y. Oct. 13, 2021) (denying summary judgment on equitable tolling where there existed "factual issues [that] should not be decided in the summary judgment context").

for equitable tolling.'" *Id.* at 70 (quoting *Torres v. Barnhart*, 417 F.3d 276, 279 (2d Cir. 2005)). As such, evidentiary hearings exploring the merits of equitable tolling claims are routine in the district courts.[21] Indeed, at times, this Court has explicitly directed an evidentiary hearing when equitable tolling involves weighing competing inferences or resolving contested factual issues. *See Brown*, 287 F.3d at 60–61 (finding an "evidentiary hearing [to be] appropriate to determine" whether "equitable tolling would be in order"); *Canales v. Sullivan*, 936 F.2d 755, 756 (2d Cir. 1991) (remanding "for an evidentiary hearing to determine if [the plaintiff's] condition warrants equitable tolling."). Going a step further, we have held that a district court abused its discretion in *not* holding an evidentiary hearing to resolve a plausible equitable tolling claim. *See Torres*, 417 F.3d at 276 (finding the district court's failure to conduct an evidentiary hearing to be an abuse).

---

[21] *See, e.g., Moore v. City of Norwalk*, No. 17 Civ. 695 (JAM), 2020 WL 6275033, at *1 (D. Conn. Oct. 26, 2020); *Montgomery v. Comm'r of Soc. Sec.*, 403 F. Supp. 3d 331, 339 (S.D.N.Y. 2018); *Moreno v. 194 E. Second St. LLC*, No. 10 Civ. 7458 (JMF), 2013 WL 55954, at *3 (S.D.N.Y. Jan. 4, 2013); *Vincent v. Wal-Mart Store 3420*, No. 10 Civ. 5536 (JFB), 2012 WL 3800833, at *5 (E.D.N.Y. Sept. 4, 2012); *Wen Liu v. Mt. Sinai Sch. of Med.*, No. 09 Civ. 9663 (RJS), 2012 WL 4561003, at *7 (S.D.N.Y. Sept. 24, 2012); *Upadhyay*, 848 F. Supp. 2d at 446–47.

36

When a district court holds an evidentiary hearing on equitable tolling, the hearing functions within the rubric of the federal rules as a bifurcated bench trial on the issue of equitable tolling.[22] Because district judges sit in equity when adjudicating equitable tolling, they are empowered at this hearing (qua bench trial) to make credibility findings, weigh evidence, and resolve factual disputes that bear on equitable tolling, so long as they stay within the bounds of the Seventh Amendment. Sometimes, district courts convene an evidentiary hearing after deciding on summary judgment that the issue cannot be resolved based on the record compiled in discovery.[23] Other times, district courts hold a hearing earlier

---

[22] It is well-established that district courts have discretion to structure the sequence of issues to be adjudicated in a given case. *See* Fed. R. Civ. P. 42(b) ("For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims."). This equally pertains to the sequencing of legal and equitable issues. *See* 8 Moore's Fed. Prac. § 39.14 ("[W]here disposition of the equitable claim would make consideration of the legal claim unnecessary, common sense dictates that the equitable claim be determined first."); 9 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2338 (4th ed.) ("If legal and equitable issues are completely independent, so that the resolution of one will not control the resolution of the other, the trial court has discretion to decide the order of trial as a matter of administrative convenience.").

[23] *See, e.g.*, *Crosby*, 2021 WL 4805465, at *2 (denying defendant's motion for summary judgment and directing evidentiary hearing to resolve factual questions applicable to equitable tolling); *Lama v. Malik*, No. 13 Civ. 2846 (LDW), 2015 WL 13758051, at *2–3 (E.D.N.Y. Sept. 9, 2015) (same); *Moreno*, 2013 WL 55954, at *3 (same); *Wen Liu*, 2012 WL 4561003, at *7 (same); *Upadhyay*, 848 F. Supp. 2d at 446-47 (same).

in the case, with an eye toward facilitating the efficient adjudication of the possibly controlling issue of equitable tolling.[24]   District courts have discretion on how to sequence the hearing, so long as they afford the parties a full and fair opportunity to be heard on the issue.   *See In re Agent Orange*, 517 F.3d at 103 ("A party must be afforded a meaningful opportunity to establish the facts necessary to support his claim.").

## B.    Application

Clark argues that in dismissing her claims, the district court "contravened the Federal Rules of Civil Procedure and this Court's precedent at every step . . . ." Appellant's Br. 3.   At base, she contends that the district court erred in holding an evidentiary hearing for factfinding purposes at the pleading stage.   But we fundamentally disagree with Clark's characterization of the proceedings below. As the record shows, the parties had moved beyond the pleading stage to a bench

---

[24] *See, e.g.*, *Moore*, 2020 WL 6275033, at *2 (resolving equitable tolling based on testimony elicited at evidentiary hearing after defendant moved to dismiss); *Montgomery*, 403 F. Supp. 3d at 339, 343 (same); *Alamo v. Berryhill*, No. 18 Civ. 210 (JCH), 2018 WL 3596751, at *3 (D. Conn. July 26, 2018) (determining at the pleading stage that evidentiary hearing was required to adjudicate equitable tolling); *F.B. by Galbato v. Berryhill*, No. 15 Civ. 148 (BKS) (CFH), 2018 WL 5777768, at *1 (N.D.N.Y. Nov. 2, 2018) (same); *Vincent*, 2012 WL 3800833, at *5 (same); *Rodriguez v. Barnhart*, No. 01 Civ. 3411 (DAB) (MHD), 2002 WL 31875406, at *7 (S.D.N.Y. Dec. 24, 2002) (same).

trial on Clark's equitable tolling claim, notwithstanding the Defendants' invocation of Rule 12(b)(6). The circumstances of this case thus call for treating the evidentiary hearing for what it functionally was—a bifurcated bench trial on the issue of equitable tolling.

To begin, the judgment on appeal is the district court's *second* dismissal of Clark's case on timeliness grounds, coming after we vacated the district court's first dismissal for failing to afford Clark notice and an opportunity to argue her equitable tolling claim. The stage, therefore, was set on remand for the parties to reach the substance of Clark's contention that she had, in fact, exercised diligence in pursuing her untimely claim, but that extraordinary circumstances prevented her from timely filing.

On remand, once the Defendants renewed their motions to dismiss, the district court held a pre-motion conference, at which it made clear to the parties that it did not believe it could properly adjudicate Clark's equitable tolling claim based solely on the allegations in the Second Amended Complaint. *See* App'x 540 (suggesting "it would not be appropriate for [the district court] to try to resolve [equitable tolling] on just the basis of the allegations of the complaint"); App'x 578 ("I'm really not comfortable with trying to decide this equitable tolling issue solely

39

on the papers that I have in front of me."). The district court thus proposed, and ultimately settled on, an evidentiary hearing, a procedural device we have time and again endorsed (sometimes even *required*) in the equitable tolling context. *See Doe*, 76 F.4th at 70; *Torres*, 417 F.3d at 279. The court made clear that the hearing would be "limited in terms of overall scope" with a focus on "trying to understand the state of mind of Ms. Clark . . . and what it is that she felt that . . . resulted in her waiting years beyond the statute of limitations" to file this action. App'x 578. But the district court permitted the parties in advance of the hearing to provide "any exhibits or documents that are not presently in the record and that any party wishes the Court to consider that bear on the issue of equitable tolling," which they did. SPA2; *see also* App'x 256–57 (exhibit list).

It is thus beyond dispute that Clark was aware going into the evidentiary hearing that the district court intended to resolve her equitable tolling claim based on the record that would be compiled at the hearing. The hearing, itself, resembled a bench trial. It included direct, cross, re-direct, and re-cross examinations of Clark, as well as oral argument from counsel on whether she had met her burden on equitable tolling. *See* App'x 356–406 (direct examination), 406–20 (cross examination), 420–474 (court's questioning), 474–81 (redirect

40

examination), 481–84 (recross examination), 484–526 (oral argument). And the hearing transcript reveals that Clark had a full opportunity to testify to the circumstances she claims prevented her from timely filing this action.

Clark faults the district court for failing to convert (either explicitly or implicitly) the Defendants' motions to dismiss into ones for summary judgment. But converting the Defendants' motions would have served no practical purpose in the context of this case. *Cf. In re G. & A. Books*, 770 F.2d at 295 (noting that the conversion rules are "governed by principles of substance rather than form"). As already discussed, district courts scrupulously avoid resolving any factual disputes on summary judgment because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Anderson*, 477 U.S. at 255. When it comes to equitable tolling, however, district judges are empowered to make precisely the types of determinations that are disallowed on summary judgment. Given the district court's authority to find facts on equitable issues, the district court's decision to convene an evidentiary hearing on the issue of equitable tolling obviated the purpose of the summary judgment exercise, *i.e.*, determining whether there are any triable issues of fact.

Clark disputes that she had a full opportunity to discover and present evidence relevant to her equitable tolling claim, arguing that the district court unduly curtailed the record by limiting what could be presented at the hearing. We are unpersuaded. District courts are vested with "wide latitude to determine the scope of discovery and we ordinarily defer to the discretion of district courts regarding discovery matters." *In re Agent Orange*, 517 F.3d at 103 (internal quotation marks, alteration, and citation omitted); *see also EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d Cir. 2012) ("Of course, as in all matters relating to discovery, the district court has broad discretion to limit discovery in a prudential and proportionate way."), *aff'd sub nom. Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134 (2014). A district court abuses its discretion only "when the discovery is so limited as to affect a party's substantial rights." *In re Agent Orange*, 517 F.3d at 103 (citation omitted).

Here, in deciding Clark's equitable tolling claim, the district court permitted limited discovery to proceed during the pendency of the Defendants' motions to dismiss.[25] At the hearing, in addition to Clark's testimony, the district court had

---

[25] The district court twice denied Defendants' request for a stay of discovery while their motions to dismiss remained pending.

before it Hanley's arrest warrant application, records of Clark's transfer history among DOC prison facilities, Clark's medical records from the period she seeks to have tolled, filings from her state habeas case, and an amicus brief filed by the New Haven Pride Center. The district court additionally permitted the parties to "file . . . any documents that they intend to use as exhibits during the hearing or that they wish the Court to consider with respect to the issue of equitable tolling . . . ." SPA3.

In setting the bounds of the available record, the district court sought to focus on matters going to the heart of Clark's theory for equitable tolling. Clark claimed that tolling was appropriate due to the combination of her mental condition and fear of retaliation at the hands of correctional officers. Fitting the contours of this claim, the district court designed the evidentiary hearing "to understand the state of mind of Ms. Clark . . . ." App'x 578. The district court's initial inclination was that it could make a determination as to the merits of her equitable tolling claim on the basis of Clark's testimony, her medical file, and the record of her state habeas case, yet the court left open the possibility that "something would surface in [Clark's] testimony that has further bearing and suggests that additional evidence would be needed . . . ." App'x 578–79.

43

Clark nevertheless protests that the district court ruled on her equitable tolling claim based on an incomplete record devoid of, for instance, "expert testimony . . . which could have illuminated the impact of sexual assault and gender dysphoria on Ms. Clark's ability to seek relief."[26]   Appellant's Br. 41; *see also* Reply Br. 12–13 (suggesting additional discovery along the lines of "expert testimony about sexual assault or gender dysphoria, . . . corroboration from prison staff, cross-examin[ations of] medical personnel about information not contained in the medical records, or investigat[ion of] instances of retaliation").   But Clark *did not raise the possibility* of introducing such testimony before the district court.

In addition, the court had more than an adequate basis to reject the additional discovery Clark *did* request.   Clark's counsel sought additional discovery relating to (1) the severity of Hanley's assaults and (2) institutional retaliation.   App'x 560.   But as the district court observed, the record already

[26] To the extent Clark contends that the district court lacked any information regarding the unique difficulties confronting transgender survivors of sexual violence, this is belied by the New Haven Pride Center's *amicus* brief submitted in opposition to the Defendants' motions to dismiss.   Dist. Ct. Dkt. No. 82-1.   The brief cites multiple studies to contextualize rates of violence perpetrated against transgender individuals alongside reasons why such instances might go unreported, *see id.* at 5–13, and the district court expressly noted it had "taken into account the arguments advanced in [this] amicus brief . . . about how transgender prisoners in general may be particularly reluctant to report abuse and vulnerable as well to retaliation," SPA19 n.67.

44

contained Hanley's arrest warrant, which included "a very detailed verbatim recitation of multiple assaults by Mr. Hanley." App'x 561. And as to institutional retaliation, Clark *had not alleged* that anyone at DOC ever threatened to retaliate against her, as opposed to ridicule her with "insulting comments." App'x 563. Concerned that Clark was "on a fishing expedition" "for merits discovery," App'x 563–64, the district court thus declined to expand the record beyond Clark's expected testimony and the discovery that had already been authorized. This was not an abuse of discretion.[27] In sum, Clark was unable to show that the information she sought was not duplicative of what was already in the record or based on speculation beyond the allegations in her complaint. We

---

[27] The dissent suggests that the district court "prevented Clark from developing and presenting" five categories of evidence that might have more fully informed its decision. Dissent at 10-11. But Clark never sought evidence as to four of these five categories (*i.e.*, affidavits or deposition testimony from the medical providers who treated her, from her fellow prisoners, from an independent psychologist, or from an expert on the difficulties faced by transgender inmates). And as to the final category—evidence concerning the assaults themselves—the district court, as we already noted, had the benefit of the detailed affidavit about Hanley's abuse that Clark included with her complaint. Clark also had the opportunity to submit "any [additional] documents" that she "wish[ed] the Court to consider." SPA3. Accordingly, Clark was hardly unable "to present the district court with a full[] picture of her circumstances." Dissent at 11.

45

thus conclude that Clark was afforded a meaningful opportunity to establish the facts necessary to support her claim.

## II.     The Seventh Amendment

Clark next argues that the district court violated her Seventh Amendment right to a jury trial by resolving contested factual issues bearing on the merits of her legal claims.   Recognizing the overarching principle that "claims in equity, including tolling, generally fall outside the Seventh Amendment's scope," Appellant's Br. 42, Clark contends that the district court "neglected the significant overlap between [her] equitable tolling argument and her Section 1983 claims," *id.* at 45, which both arise from the same set of operative facts—Hanley's sex crimes. Clark asserts that it is impossible to disentangle the district court's factual findings on equitable tolling from those relating to her legal claims.    But as set forth below, the district court's decision did not violate the Seventh Amendment.

"The Seventh Amendment protects the right to a jury trial only for matters at law, 'in contradistinction' to those in equity."   *In re CBI Holding Co., Inc.*, 529 F.3d 432, 465 (2d Cir. 2008) (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989)); *see also* U.S. Const. amend. VII ("In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be

preserved . . . ."). Even then, "the right to a jury trial exists . . . only with respect to disputed issues of fact." *Shore v. Parklane Hosiery Co.*, 565 F.2d 815, 819 (2d Cir. 1977), *aff'd*, 439 U.S. 322 (1979). "When legal and equitable claims are joined in the same action, 'the right to jury trial on the legal claim, including all issues common to both claims, remains intact.'" *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 550 (1990) (quoting *Curtis v. Loether*, 415 U.S. 189, 196, n. 11 (1974)). "To safeguard this right," we have said that "the general rule is that the jury must decide the legal claims prior to the court's determination of the equitable claims, in order to prevent the court's determination of a common factual issue from precluding, by collateral estoppel effect, a contrary determination by the jury." *Wade v. Orange Cnty. Sheriff's Off.*, 844 F.2d 951, 954 (2d Cir. 1988) (internal citations omitted) (citing *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510–11 (1959); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479 (1962)); *see also* Wright & Miller, § 2338 ("If . . . issues of fact are common to both the legal and equitable claims and a jury has been demanded on the common issues that are material to the legal claim, a jury must be permitted to determine these issues prior to deciding the equitable aspects of the case"). This is a prudential rule, *see Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 334 (1979), and one the district court acknowledged in explaining that it could

only "determine the issue of equitable tolling provided that it [did] not make factual determinations reserved by the Seventh Amendment for a jury to resolve as to a plaintiff's legal claims." SPA2.

This general rule was not dishonored here. "The Court's concern in these cases has been the *res judicata* or collateral estoppel effect of a prior determination of an equitable claim upon questions common to a legal claim."[28] *Heyman v. Kline*, 456 F.2d 123, 130 (2d Cir. 1972). Consistent with the preclusion standard, when considering whether resolution of an equitable claim might infringe on the jury trial right, we have "consider[ed] whether the elements of [the] claim[s] . . . are so similar that a finding in favor of [a party] on one claim necessitates a finding for [that party] on the other claim" as well.[29] *Song v. Ives Laboratories, Inc.*, 957 F.2d

---

[28] In order for a prior ruling to have collateral estoppel effect on a given issue, "(1) the issues in both proceedings must be identical; (2) the issue in the prior proceeding must have been actually litigated and actually decided; (3) there must have been a full and fair opportunity for litigation in the prior proceeding; and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits." *S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 304 (2d Cir. 1999); *accord Seneca Nation v. Hochul*, 58 F.4th 664, 668 (2d Cir. 2023).

[29] The foundational Supreme Court cases enshrining the importance of preserving a litigant's jury trial right when legal and equitable claims are presented together involved drawing factual conclusions that would *necessarily* have decided both types of claims. *See Dairy Queen*, 369 U.S. at 479–80 (holding that jury trial was required where legal claims seeking monetary relief and equitable claims seeking injunctive relief both

1041, 1048 (2d Cir. 1992) (concluding that a district court sitting in equity on a Title VII claim must conform its findings to those a jury rendered in the same case sitting at law on an employment discrimination claim under New York State Human Rights Law).   But that is simply not the case in the circumstances here.

At the start, the factual issues relevant to Clark's equitable tolling claim and her § 1983 claims are analytically and temporally distinct.   Her deliberate indifference claim, for instance, is fundamentally backward-looking, pertaining to the conditions of Clark's confinement and Defendants' awareness and behavior up to the time she was sexually assaulted.   S*ee Morgan v. Dzurenda*, 956 F.3d 84, 89 (2d Cir. 2020) (outlining the elements of an Eighth Amendment deliberate indifference claim, which requires an inmate to prove "(1) that [the plaintiff] is incarcerated under conditions posing a substantial risk of serious harm, and (2) "that the prison official had a sufficiently culpable state of mind, which in prison-

---

hinged on "the question of whether there [had] been a breach of contract"); *Beacon Theatres*, 359 U.S. at 503–04 (holding that jury trial was required where legal and equitable claims both turned on the reasonableness of certain exclusive rights afforded to a theater to show first-run movies, which involved gauging the level of competition between two theaters).   And even then, there are circumstances in which courts may proceed to resolve an equitable claim first, "'even though the results might be dispositive of the issues involved in the legal claim.'" *Parklane Hosiery*, 439 U.S. at 335 (quoting *Katchen v. Landy*, 382 U.S. 323, 339 (1966)).

conditions cases is one of deliberate indifference to inmate health or safety" (internal quotation marks omitted)). So, too, Clark's constitutional claim against Hanley for sexual abuse requires assessing his assaultive conduct at the time it occurred. *See Crawford v. Cuomo*, 796 F.3d 252, 256–58 (2d Cir. 2015) (explaining that sexual abuse by a corrections officer is cognizable where (1) "the defendant acted with a subjectively sufficiently culpable state of mind" and (2) the conduct was objectively harmful enough or sufficiently serious to reach constitutional dimensions" (internal quotation marks and citation omitted)). The equitable tolling inquiry, by contrast, is trained solely on the circumstances that Clark faced *after* the date her claims accrued. *See Smalls*, 10 F.4th at 145 ("Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that [s]he has been pursuing [her] rights diligently, and (2) that some extraordinary circumstance stood in [her] way." (internal quotation marks and citation omitted)).

Should liability be established, the damages inquiry as to Clark's claims would require that the jury determine *how much* money would compensate Clark for the harm that the Defendants' misconduct caused her to suffer. But this is distinct from the district court's equitable tolling inquiry, which required assessing *whether* the harm Clark suffered *caused* her to miss the filing deadline despite

50

reasonable diligence in pursuing the claim. To be sure, both inquiries touch upon the consequences of Hanley's sexual assault, but neither depends on the other; a jury could assign any degree of monetary value to the harm notwithstanding whether the district court found that harm to have been an extraordinary obstacle that prevented Clark from timely filing suit.[30] Clark argues, to the contrary, that several features of the decision below foreclose aspects of her legal claim. But this is simply incorrect.

First, Clark takes issue with the district court's "sweeping credibility determinations," which she asserts usurped the jury's role to gauge her credibility on the critical issue of the impact of Hanley's abuse. Appellant's Br. 45. But the district court's credibility findings were limited to specific aspects of Clark's testimony that related squarely to whether she encountered circumstances that caused her to delay in filing her complaint. These findings cannot be said to have

---

[30] The dissent contends that the severity of Hanley's abuse is an issue common to Clark's equitable tolling and Section 1983 claims. Dissent at 17. We disagree. True, "Clark bears the burden of demonstrating that Hanley's abuse was of constitutional magnitude" in asserting her Section 1983 claims. *Id.* But the equitable tolling inquiry is different. It focuses on a distinct question: whether the abuse and its effects—severe or not—caused Clark to delay in filing suit.

51

resolved any issues "identical" or even "common" to those presented on her legal claims. *See Seneca Nation v. Hochul*, 58 F.4th 664, 668 (2d Cir. 2023).

For instance, the district found that Clark's "testimony that she actually feared retaliation if she filed this lawsuit was not credible." *Clark*, 2022 WL 124298, at *6. But whether Clark, in fact, suspected she would face retaliation for filing this lawsuit has no bearing on any element of her constitutional claims. Similarly, the court disbelieved Clark's denial, contrary to the affirmation of DeCruz, that she affirmatively "requested to speak to a state trooper to file a complaint" against Hanley. *Clark*, 2022 WL 124298, at *6 n.42. But, again, whether Clark solicited DaCruz to relate the circumstances of her abuse does not bear on the elements of her legal claims and is not a factual issue of relevance—let alone identity—to the merits of these claims. Finally, the district court determined that "Clark falsely testified that she lied [to Cheshire mental health staff about being psychologically stable] because she realized how damaging the notes of her statements to the mental health staff at Cheshire were to her claim for equitable tolling in this case." *Id.* at *7 n.55. But this finding, too, is specifically

52

tied to her equitable tolling claim and does not purport to establish that she did not, in fact, suffer from abuse-related harm during her incarceration.[31]

Clark next contends that the district court determined that "'the trauma stemming from Hanley's sexual abuse' was not meaningfully 'severe,'" foreclosing her from seeking emotional damages from a jury. Appellant's Br. 46 (quoting *Clark*, 2022 WL 124298, at *6, *7). But Clark overreads the district court's findings on the effect of Hanley's abuse. Far from concluding that Clark suffered *no* harm or trauma stemming from Hanley's abuse, the district court directly acknowledged Clark's suffering in the aftermath of the abuse, which was aggravated by her gender dysphoria. *See Clark*, 2022 WL 124298, at *6 ("I do not doubt the evidence that Hanley abused Clark and that Clark was also deeply depressed—at times to the point of self-harm—as well as conflicted about her gender"). Moreover, the district court's factual findings as to the effects of Hanley's abuse were all expressly tied to whether they caused Clark to delay filing

---

[31] The fact that Clark's medical records, if she had succeeded in establishing a basis for equitable tolling, might have been presented to the jury on the issue of damages does not change this analysis. "[C]onsideration of some aspects of the same relevant evidence" does not create a Seventh Amendment issue. *Afga Corp. v. Creo Products Inc.*, 451 F.3d 1366, 1374 (Fed. Cir. 2006); *see also Gardco Mfg., Inc. v. Herst Lighting Co.*, 820 F.2d 1209, 1213 (Fed. Cir. 1987).

this lawsuit. *See, e.g., Id.* at *7 ("If Hanley's abuse of Clark was so traumatic *that it prevented Clark from filing a court action for seven years*, one would reasonably expect some sign of this trauma to surface in the extensive notes of conversations between Clark and prison mental health counselors" (emphasis added)); *id.* at *9 ("Although I credit Clark's claim that she suffers from gender dysphoria, the evidence does not show that her dysphoria or any other underlying mental condition *prevented her from filing this lawsuit within the three years of Hanley's assaults . . . .*" (emphasis added)). This is not an issue common to the damages inquiry a jury would undertake.

Finally, Clark asserts that the district court ignored how her allegations of retaliation relate to the merits of her deliberate indifference claim. She contends that the district court preempted her ability to argue that "the MacDougall-Walker Defendants' involvement in the Hanley investigation evidenced their knowledge of the substantial risk that Hanley posed to inmates . . . ." Appellant's Br. 47–48. Again, the district court did no such thing. Clark testified at the evidentiary hearing that Manley, who investigated Hanley's assaults on Clark, did "the right thing" in helping to hold Hanley to account after his assaultive conduct. App'x 426–27. The district court referenced this portion of Clark's testimony to

54

highlight that Clark had no explanation, given this testimony, as to why she feared

retaliation from Manley in the aftermath of the investigation. *Clark*, 2022 WL

124298, at *5. Contrary to Clark's contention, however, the district court made

no factual finding as to Manley's—or any other Defendant's—awareness of

Hanley's conduct *before* Clark's claims accrued, as a result of the *earlier*

investigation. And in any event, whether Manley attempted to dissuade Clark

from filing suit is an issue entirely distinct from her legal claims.

Clark cites cases to support the proposition that her equitable tolling claim

should be submitted to the jury. But because these cases involve a much closer

identity of relevant facts bearing on the equitable and legal questions, they

undercut rather than support her position. In *Robertson v. Seidman & Seidman*, for

example, the plaintiff brought legal claims against an accounting firm alleging that

the firm fraudulently concealed its preparation of false and misleading financial

documents for a company of which the plaintiff was a shareholder. 609 F.2d 583,

585 (2d Cir. 1979). The plaintiff sought equitable tolling "by reason of this alleged

fraudulent concealment . . . ." *Id.* at 593. We determined that the jury should

decide "whether there was fraudulent concealment sufficient to invoke the federal

equitable tolling doctrine" because both Robinson's legal and equitable claims

55

required determining precisely the same issue: whether the accounting firm had fraudulently concealed its misconduct. *Id.* But unlike in *Robertson*, Clark's equitable tolling and § 1983 claims are analytically and temporally distinct.

Clark also cites *Ott v. Midland-Ross Corp.*, an employment discrimination case in which the Sixth Circuit concluded that the issue of equitable tolling should be heard by a jury alongside the plaintiff's legal claims. 600 F.2d 24, 28 (6th Cir. 1979). But as in *Robinson*, the claims were not distinct: the *Ott* plaintiff alleged that he was wrongfully discharged because of his age by an employer who fraudulently induced him into a consulting arrangement to secure a waiver of the plaintiff's right to sue for age discrimination. *Id.* at 26–27. The plaintiff sought equitable tolling on the grounds that he was fraudulently induced to forego suit by entering into this agreement. *Id.* at 30–31. The Sixth Circuit found "submission of the entire case to the jury [to be] particularly appropriate" because the merits of the age discrimination claim necessitated an inquiry into the employer's "motives for terminating [the plaintiff]," while his equitable tolling claim similarly brought into question the "good faith of [the employer] in offering the consultation agreement[.]" *Id.* at 31. More than just a degree of factual overlap, both inquiries were "pieces of the larger mosaic of [the employer's]

56

treatment of [the plaintiff]." *Id.* This stands in contrast to Clark's case, where her equitable tolling claim hinges on her own mental state and perception of the risk of retaliation, while her constitutional claims turn entirely on the Defendants' conduct and knowledge at a time prior to the period she seeks to have tolled.

In sum, the district court did not intrude on Clark's jury trial right by determining whether she was entitled to relief from the statute of limitations before proceeding further with her case. Clark's argument for equitable tolling is distinct from the merits of her legal claims and the decision below treated them as such. Accordingly, the district court did not violate the Seventh Amendment in determining that Clark failed to establish the "rare and exceptional circumstances" necessary to excuse an untimely filing. *Walker*, 430 F.3d at 564 (citation omitted).

## III. Equitable Tolling Analysis

Clark maintains, finally, that the record assembled at the evidentiary hearing compels the conclusion that she is entitled to equitable tolling as a matter of law. From the premise that "medical conditions, whether physical or psychiatric, can manifest extraordinary circumstances depending on the facts presented," *Harper v. Ercole*, 648 F.3d 132, 137 (2d Cir. 2011), Clark urges that the

57

record "leaves no doubt" that the combination of Hanley's repeated sexual assaults, her particular mental condition, and her fear of reprisal presented extraordinarily severe obstacles to her filing this case as a matter of law. We do not discount Clark's traumatic experiences or that such circumstances could warrant equitable tolling in the appropriate case. Here, however, we cannot conclude that that district court abused its discretion in deciding that Clark failed to establish a basis for equitable tolling.

As previously noted, we review equitable tolling determinations for abuse of discretion, that is, with an eye toward whether the district court's ruling is "within the range of possible permissible decisions." *See Phillips*, 723 F.3d at 149 (internal quotation marks and citation omitted). If an asserted error is legal in nature, our review is *de novo*; meanwhile, we review factual determinations for clear error. *Id.* Clark posits both types of errors. But the record establishes no basis for upsetting the district court's determination.

Turning to the first of the district court's supposed *legal* errors, Clark claims that in analyzing her fear of retaliation, the district court focused its analysis only on the *Defendants'* efforts to threaten or retaliate against her, when the law is clear that non-defendants can equally contribute to extraordinary circumstances for

58

equitable tolling purposes.    But the district court did not ignore Clark's concerns

about non-defendant corrections officials, let alone proceed under a rule that fear

of retaliation from a non-defendant cannot support equitable tolling.    Rather, the

district court, relying on *Davis v. Jackson*, No. 15 Civ. 5359 (KMK), 2016 WL

5720811, at *11 (S.D.N.Y. Sept. 30, 2016), simply explained that "in the prison

context, reasonable fear of retaliation may be sufficient to constitute extraordinary

circumstances warranting equitable tolling, *particularly if the person threatening*

*retaliation is a defendant or another official who could be or was influenced by a defendant.*"

*Clark*, 2022 WL 124298, at *4 (emphasis added).    The court specifically considered

the "other correctional officials," *id.*, who Clark claimed made her feel vulnerable,

but ultimately found her allegations too vague to support a valid threat of

retaliation.    *See also id.* at *5 (noting that "Clark never reported any of the alleged

insults made to her by *any officers*, much less any belief she purportedly had that

*these officers* were trying to intimidate her from filing a court action against any of

the named defendants in this action" (emphases added)).    This was not legal

error.

The district court's other asserted legal error is for failing to factor Clark's

gender dysphoria into its analysis.    But Clark mischaracterizes the decision

59

below. The court stated that it did not doubt that Clark was "conflicted about her gender" and that she was "subject to depression and gender dysphoria," and the court expressly "credit[ed] Clark's claim that she suffers from gender dysphoria." *Id.* at *6, *9. Clark dismisses the court's discussion of her mental condition as making "no reference to the clinical conditions that accompany gender dysphoria and giv[ing] no consideration to whether or how sexual assault might affect a transgender individual suffering from the condition." Appellant's Br. 62. Far from ignoring Clark's medical condition, however, the court expressly took it into account but concluded that "the evidence does not show that her dysphoria or any other underlying mental condition prevented [Clark] from filing this lawsuit within the three years of Hanley's assaults from August 2011 to August 2014." *Clark*, 2022 WL 124298, at *9. As already noted, the court cast doubt on Clark's claim that she was unable to talk about Hanley's abuse by pointing to the fact that soon after the events in question, she provided a full statement to the Connecticut police. Moreover, in late 2011 into 2012—within the period Clark seeks to have tolled—Clark filed the habeas petition in state court, which the district court believed "strongly weighs against a conclusion that Clark was so psychologically immobilized that she lacked the ability at that time to file a federal civil rights

60

complaint to seek relief for Hanley's sexual abuse." *Id.* at *7. Again, there was no legal error.

On the factual side, Clark argues that "the district court's finding of no extraordinary circumstances is clearly erroneous" because "[t]he entire evidence assembled here compels the conclusion that Ms. Clark faced extraordinary circumstances that warrant equitable tolling." Appellant's Br. 68–69. She disputes, for instance, the district court's conclusion that her fear of retaliation was not credible. The district court discounted Clark's testimony regarding her fear of retaliation, however, because Clark did not attest to any overt threat of retaliation by any relevant actor, did not report any of the alleged insults that ostensibly generated her fear, and because her medical records make no mention of any officer harassment. The court's skepticism on this point, then, was grounded in the record and is not based on any clearly erroneous finding of fact. *See Sulzer Mixpac AG v. A&N Trading Co.*, 988 F.3d 174, 181 (2d Cir. 2021) ("Factual findings are clearly erroneous if they are without adequate support in the record, are against the clear weight of the evidence, or are the product of an erroneous view of the law." (internal quotation marks and citation omitted)). Clark, in effect, urges us to adopt a more favorable view of her testimony than that taken

61

by the district court.    But we are not free to reject a district court's factual findings absent clear error, which Clark has failed to show.

Finally, Clark points to the district court's preliminary observation that:

> As to the trauma stemming from Hanley's sexual abuse, the assaults on Clark were plainly unlawful, wrong, and abusive.    But these assaults were not physically coercive or made under threat of harm or retaliation. They were unlike a violent sexual assault or rape that would likely result in the most severe type of psychological trauma.

*Clark*, 2022 WL 124298, at *6.    To be sure, we do not endorse the proposition—for which there is no record evidence—that certain types of assault are more or less likely to cause severe psychological trauma across all victims in all settings.    But we need not endorse such a proposition to conclude, here, that the district court did not clearly err in determining *as to Clark* that her trauma did not prevent her from filing a timely suit.    In other words, this remark does not obviate the district court's otherwise sound factfinding, nor constitute a basis for upsetting the court's work.[32]

---

[32] The dissent characterizes this remark as a conclusion, Dissent at 4, and as a factual finding, Dissent at 22.    We do not read the district court's comment to hold such weight. It is a characterization of the assaults, phrased in the abstract, unsupported by any citation, and immediately followed with more case-specific reasoning that forms the

After conducting an evidentiary hearing at which the district court heard from Clark firsthand, and after considering her testimony in light of the assembled record, the district court determined that Clark failed to show that her psychological state prevented her from complying with the statute of limitations. The onus was on Clark to show both extraordinary circumstances and that she exercised "reasonable diligence throughout the period [she seeks] to toll." *Walker*, 430 F.3d at 564. Yet, Clark undertook no effort at filing this case for nearly five years after her claims accrued—already two years beyond the limitations period—and did not actually file it for another two years, even as she pursued her habeas claim. Even accepting Clark's testimony that coming out as transgender in April 2016 was a watershed moment in her life that alleviated an immense amount of pressure and anxiety, the district court did not clearly err in giving weight to those portions of the record that undermined her claim to equitable tolling. And absent legal error or a clearly erroneous factual finding, it is not for an appellate court to substitute its judgment for that of the appropriate factfinder in areas within its purview. We decline to do so here.

---

basis of the district court's determination as to whether the harmful effects of Hanley's abuse caused Clark to delay in filing suit.

**CONCLUSION**

In sum, the district court employed proper procedures in adjudicating Clark's equitable tolling claim and did not intrude on Clark's Seventh Amendment right. We perceive no infirmity in the district court's factfinding nor in its decision to dismiss Clark's claims as untimely. Accordingly, we **AFFIRM** the judgment of the district court.

CHIN, *Circuit Judge*, dissenting:

In 2011, Thomas Hanley, a Connecticut corrections officer, repeatedly sexually assaulted Veronica-May (then known as Nicholas) Clark, a transgender woman incarcerated at the MacDougall-Walker Correctional Institute ("MacDougall-Walker").  Hanley eventually resigned, was arrested in connection with his assaults on Clark, and pleaded guilty to three counts of sexual assault in the fourth degree.

Clark filed this civil rights action *pro se* in the district court -- but she did not do so until well after the applicable limitations period expired.  The district court *sua sponte* dismissed the case as untimely.  This Court remanded, concluding that Clark should be afforded an opportunity to present her claim that the statute of limitations should be equitably tolled.

On remand, with the assistance of counsel, Clark filed a second amended complaint.  She alleged that she remained silent because she was "deeply and profoundly scarred," App'x 123, a consequence of the trauma she suffered from the sexual assaults, her fear of continued harassment and further retaliation (exacerbated by her continued housing for periods of time at

MacDougal-Walker), and the denial of medical and mental health treatment for her depression and gender dysphoria.

After defendants-appellees moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the district court held an evidentiary hearing. It concluded that Clark was not credible in material respects, granted the motions, and dismissed the Complaint. The majority now affirms.

I agree that the district court did not err in holding an evidentiary hearing on the question of equitable tolling. *See ante*, at 5. We have routinely approved of this practice and have even reversed district courts for failing to conduct evidentiary hearings where plaintiffs have put forward plausible claims of equitable tolling. *See, e.g.*, *Brown v. Parkchester S. Condos.*, 287 F.3d 58, 60-61 (2d Cir. 2002) (vacating and remanding, where "it appears there may be substance to [a plaintiff's] claim[,]" because "an evidentiary hearing is appropriate to determine [whether] . . . equitable tolling would be in order"). I also agree that when a district court convenes an evidentiary hearing on equitable tolling, the court's role is that of a factfinder; the proceeding, as the majority puts it, functions as a bench trial on facts related to tolling. *See ante*, at 37.

2

I disagree with the majority, however, in two principal respects. First, although district courts have wide latitude in structuring discovery and conducting evidentiary hearings, here the district court failed to afford Clark a "meaningful opportunity" to make the case that her circumstances warranted tolling. *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 103 (2d Cir. 2008) (quoting *Long Island Lighting Co. v. Barbash*, 779 F.2d 793, 795 (2d Cir. 1985)). The court convened an evidentiary hearing on only a few weeks' notice and before discovery could be completed, took testimony from no one besides Clark, and reviewed only a subset of Clark's medical records. Perhaps because the district court did not hear directly from the healthcare providers who worked with Clark, did not consider affidavits or deposition testimony from the prisoners and corrections officials who knew her, and did not have before it any expert testimony, the district court minimized the harm Hanley inflicted on her and found that aspects of Clark's testimony were "neither plausible nor credible." *Clark v. Hanley*, No. 18 Civ. 1765, 2022 WL 124298, at *7 & n.55, *9 (D. Conn. Jan. 13, 2022). Perhaps it would have concluded otherwise if it had had a fuller evidentiary record, including testimony from experts on the barriers transgender prisoners face in reporting sexual assault.

3

Second, to the extent the judgment rests on factual findings about the severity of Hanley's conduct and its effect on Clark, those findings were not the district court's to make. The Seventh Amendment to the U.S. Constitution guarantees Clark the right to have matters that go to the heart of her legal claims be decided by a jury. The district court's findings deprived Clark of her right to present those issues to a jury. It concluded, for example, that Hanley's behavior was "not physically coercive or made under threat of harm or retaliation" and was "unlike a violent sexual assault or rape that would likely result in the most severe type of psychological trauma." *Clark*, 2022 WL 124298, at \*6. These were issues that Clark was entitled to submit to the jury.

Because the district court failed to afford Clark an adequate opportunity to develop evidence in support of her equitable tolling claim and intruded into the province of the jury, I would vacate and remand. Accordingly, I dissent.

I.

I address first the issue of discovery. It is troubling that the district court denied Clark's request for equitable tolling based on a factual record that was underdeveloped, both procedurally and substantively. The district court

4

convened the evidentiary hearing on less than four weeks' notice and did not give Clark an adequate opportunity to gather the information she needed -- and that she told the district court she needed -- to make out her equitable tolling claim.

As the majority emphasizes, "[d]istrict courts have 'wide latitude to determine the scope of discovery'" and "a discovery ruling will warrant relief on appeal only if it constitutes an 'abuse of discretion.'" *Figueroa v. Mazza*, 825 F.3d 89, 99 (2d Cir. 2016) (quoting *In re Agent Orange*, 517 F.3d at 103). Our review in this posture is highly deferential: "A district court abuses its discretion *only* 'when the discovery is so limited as to affect a party's substantial rights.'" *In re Agent Orange*, 517 F.3d at 103 (emphasis added) (quoting *Long Island Lighting*, 779 F.2d at 795). One of those substantial rights "is that '[a] party must be afforded a meaningful opportunity to establish the facts necessary to support [her] claim.'" *In re 650 Fifth Ave. & Related Props.*, 934 F.3d 147, 157 (2d Cir. 2019) (quoting *In re Agent Orange*, 517 F.3d at 103).

The record demonstrates that the district court gave short shrift to Clark's efforts to show that Hanley's abuse created a "sever[e] . . . obstacle impeding compliance with a limitations period." *Harper v. Ercole*, 648 F.3d 132,

5

137 (2d Cir. 2011). I would hold that the district court abused its discretion by curtailing Clark's ability to obtain discovery on matters clearly relevant to equitable tolling. This, in turn, limited Clark's ability to vindicate her Eighth Amendment rights.

On August 26, 2021, at a hearing on defendants' motions to dismiss, the district court, apparently *sua sponte*, proposed holding an evidentiary hearing. The district court first asked Hanley's counsel whether it would be a "problem if I decided to hold a hearing to hear from the plaintiff and make a determination whether the plaintiff's stated grounds for equitable tolling have merit." App'x 541. Both Hanley's counsel and counsel for the MacDougall-Walker Defendants said they thought a hearing was unnecessary because the district court could decide their motions to dismiss on the papers alone. *See id.* at 542-43. In contrast, Clark's counsel expressed concern with the district court's proposal: "[H]ere's the issue I have with the hearing, Your Honor. I think courts have been reluctant to decide equitable tolling without the benefit of discovery. And I think the reason why is because equitable tolling is such a factually intense question." *Id.* at 557. Clark's counsel represented that, as of the date of the hearing, the defendants had produced no discovery at all. *See id.* at 558 (Clark's

6

counsel: "We haven't heard from the State or received any discovery."). In response to the court's suggestion that a hearing at which Clark alone would testify would be sufficient for the court to "make a determination whether equitable tolling is established," *id.* at 560, Clark's counsel explained that additional discovery was necessary, *see id.* at 560-61. Clark's counsel indicated that she wished to seek "discovery relating to the assault circumstances which would show, I think, how severe those assaults were and . . . how long lasting the impacts on her mental condition would be" as well as discovery "related to the institution['s] retaliation and the impact on plaintiff." *Id.* at 560. Clark's counsel argued that "it would be unfair for this case to be dismissed when we don't have the discovery that the State was ordered to provide." *Id*. at 558.

The district court insisted that between Clark's testimony, her medical records, and other documents already available, Clark's counsel had sufficient information to argue her equitable tolling claim. *See id.* at 561-62. "I have to say, what more do you want?" *Id.* at 561. The district court criticized Clark's counsel for "looking for merits discovery" and noted that counsel already had Clark's 2011 statements to the state troopers who were investigating Hanley's misconduct. *Id.* at 563. "Why do you need to know more about what

7

happened," the court asked, "when your client knows very well what happened and told them at the time?" *Id.* at 562.

As it became increasingly clear the district court was going to schedule an evidentiary hearing at which Clark alone would testify, her counsel reluctantly asked the court to order the MacDougall-Walker Defendants to produce all discovery previously requested, particularly Clark's medical records. *See id.* at 570-71. In the end, the district court concluded that "it's really appropriate to have an evidentiary hearing, one that's limited in terms of overall scope. . . . [T]o me the key issue is trying to understand the state of mind of Ms. Clark." *Id.* at 578. In an order dated August 27, 2021, the court ordered the production of discovery by September 3; scheduled an evidentiary hearing for September 20; limited the hearing to "the testimony of Clark and to the Court's additional consideration of any exhibits or documents that are not presently in the record"; and set September 16 as the deadline for filing any such materials. *Clark v. Hanley*, No. 18 Civ. 1765, 2021 WL 4192108 (D. Conn. Aug. 27, 2021). The hearing occurred as scheduled, *see* App'x 348, and the district court received into evidence only Clark's testimony and eighteen exhibits from her prison medical

8

records, *see id.* at 352-53.[1]  There is no indication the court invited the parties to submit further evidence after the hearing concluded.

For three interrelated reasons, I would hold that the district court abused its discretion by denying Clark a "meaningful opportunity," *In re Agent Orange*, 517 F.3d at 103, to obtain and present evidentiary support for her equitable tolling claim.

First, the district court scheduled the evidentiary hearing on short notice.  It did not afford Clark time to meaningfully seek evidence in addition to what she was already owed and the MacDougall-Walker Defendants were already late in producing.  Only twelve business days separated the district court's order scheduling the evidentiary hearing and the deadline for Clark to submit any documents not already part of the record.  Only one further business day separated that deadline and the day of the hearing itself.  Such an abbreviated timetable is perhaps not surprising in light of the district court's repeated comments that Clark's counsel already had sufficient information to argue her equitable tolling claim.  *See, e.g.*, App'x 561, 563.  Nevertheless, the

---

[1]    In addition, the district court granted permission for the New Haven Pride Center to file an *amicus curiae* brief in support of Clark.  *See Clark,* 2022 WL 124298, at *9 n.67; App'x 354.

limited time frame allotted for discovery did not provide Clark with a sufficient opportunity to develop evidence in support of her claim. *See In re Agent Orange*, 517 F.3d at 103 ("A party must be afforded a meaningful opportunity to establish the facts necessary to support his claim."); *Benjamin v. Jacobson*, 172 F.3d 144, 166 (2d Cir. 1999) (vacating and remanding where, *inter alia*, "plaintiffs should have been given an opportunity to present evidence" in support of their claim).[2]

Second, the district court erroneously concluded that additional discovery was not needed. The benefits of such discovery would almost certainly have been more than "hypothetical." App'x 578. The district court's approach to the evidentiary hearing prevented Clark from developing and presenting such evidence as (1) affidavits or deposition testimony from the medical and mental health providers who worked with Clark and made the notes contained in her records; (2) additional documentary evidence or deposition testimony concerning the circumstances and effects of Hanley's assaults; (3) affidavits or deposition testimony from fellow prisoners about the

---

[2]    The majority contends that Clark has not argued that she had "too short a time frame" to have "a meaningful opportunity to establish the relevant facts." *Ante*, at 29 n.16. In fact, in her brief on appeal, Clark argues that the district court "failed to afford [her] appropriate opportunity to take discovery and gather evidence." Brief for Plaintiff-Appellant at 3.

10

risk of retaliation Clark might have faced had she complained about Hanley's assaults (or about other inmates' and corrections officers' responses to them) or had she filed suit earlier; (4) an independent psychological evaluation of Clark; and (5) other expert testimony.[3]

Such evidence would have enabled Clark to present the district court with a fuller picture of her circumstances. Moreover, the evidence the district court *did* permit Clark to offer was rife with shortcomings. The majority of Clark's medical records consist of reports prepared in relation to specific events, often emergencies. *See, e.g.*, App'x 585. Some are "infirmary admission orders," which describe the circumstances leading a prisoner to present herself for treatment. *See, e.g., id*. at 589, 595, 600, 610. Others are "transfer summar[ies],"

---

[3] The majority contends that "Clark never sought evidence as to four of these five categories." *Ante*, at 45 n.27. While it is true that at the hearing Clark's counsel did not explicitly identify these discrete categories of discovery, counsel described broadly the discovery that "would be helpful for equitable tolling." App'x 560. This included "medical information" and "discovery relating to the assault circumstances which would show . . . how severe those assaults were" and "how long lasting the impacts on her mental condition would be." *Id*. Counsel also referred to "the other category of discovery, painting in sort of broadbrush strokes, that we asked for with respect to tolling related to the institutional[] retaliation and the impact on the plaintiff." *Id*. Counsel further identified "bases for justifying equitable tolling," including "[f]ear of retaliation," "mental condition," "medical condition," and "[a]dministrative exhaustion," noting that there is "a full . . . spectrum" of factors relevant to equitable tolling. *Id*. at 565. Surely these descriptions would encompass the information in the five categories above, which are only examples of the type of information that could shed light on Clark's state of mind for purposes of equitable tolling.

documenting at a high level of generality a prisoner's medical and mental health conditions when she is being moved from one DOC facility to another. *See, e.g.*, *id.* at 591, 602. Reflecting the severity of mental distress Clark experienced, two of her medical records contain "suicide risk assessments," one dated January 8, 2012, *id.* at 597-98, and the other dated July 15, 2016, the day Clark attempted to castrate herself, *id.* at 612-13. Of the medical records before the district court, only four pages contain narrative notes by Clark's healthcare providers. *See id.* at 587, 604, 606, 608. But no volume of medical records alone could have compensated for the absence of testimony from Clark's healthcare providers, her fellow prisoners, or an independent psychologist and other experts.

Third, the district court wrongly assumed that Clark -- a survivor of sexual abuse with an extensive mental health history -- could adequately explain the impact of what Hanley did to her, more than a decade after the fact. The district court reached this conclusion notwithstanding amicus's admonition that "transgender survivors of sexual assault face exceptional barriers to reporting their assailants" and that such barriers include "justifiable distrust of authorities, the risk of further victimization as a response to reporting, history of past trauma, the pervasive discrimination they face in their daily lives, and the

12

heightened discomfort they may feel as to intimate physical examinations." *Clark v. Hanley*, No. 18 Civ. 1765, Dkt. 82-1 at 4 (D. Conn. July 12, 2021). Moreover, amicus warned, "prison [is] an exceptionally challenging setting in which to report abuse," especially for transgender prisoners. *Id.* at 8.

The district court likely overestimated both Clark's capacity to disclose Hanley's conduct to prison healthcare providers and her ability to describe the effects of Hanley's assaults, particularly in the adversarial and charged atmosphere of an evidentiary hearing. As a consequence, the court issued a decision replete with adverse findings about Clark's credibility without giving Clark a "meaningful opportunity" to contextualize her testimony via the opinions of experts in sexual abuse, gender dysmorphia and gender transition, the psychological dynamics associated with prisoners' fears of retaliation on the part of corrections officials, and other topics relevant to Clark's case. Expert testimony, combined with further development of the factual record, could very well have corroborated Clark's statements about her fear of retaliation and the impact of Hanley's assaults. Such evidence could also have confirmed why, as Clark's medical records appear to corroborate, she took steps to bring this

13

lawsuit only after she came out as transgender and began to receive consular support and adequate medical care.[4]

Instead of giving Clark the opportunity she deserved to "establish the facts necessary to support [her] claim," *In re Agent Orange*, 517 F.3d at 103, the district court scheduled an evidentiary hearing on less than a month's notice, declined Clark's request for discovery beyond the limited discovery the court allowed, and placed on Clark's shoulders the burden of recalling her mental state over a period of some five years and explaining why she could not have come forward sooner. I would hold that the combined effect of these decisions prejudiced Clark's substantial rights and that, therefore, the district court abused its considerable discretion in limiting discovery on Clark's equitable tolling claim and conducting an evidentiary hearing in the expedited and limited manner that it did.

---

[4]    The majority notes that Clark did not raise in the district court the issue of calling expert witnesses. *See ante*, at 44.  But the district court afforded Clark's counsel less than four weeks to prepare for the evidentiary hearing, and the district court made clear at the hearing on defendants' motion to dismiss that it would only permit Clark to testify. *See id*. at 580 (court confirming that its intention was that the hearing would be "confined to testimony from the plaintiff").  Thus, any request for expert testimony would have been futile.

## II.

In my view, the district court denied Clark the protections of the Seventh Amendment because, in its opinion denying her request for equitable tolling, the district court found facts that are common to Clark's equitable tolling and Section 1983 claims.

The Seventh Amendment limits the facts that a district court, sitting in this posture, is empowered to find.  In pertinent part, the amendment provides that "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved."  U.S. Const., amend. VII.  The guarantee of a jury trial "was held in such esteem by the colonists that its deprivation at the hands of the English was one of the important grievances leading to the break with England."  *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 340 (1979) (Rehnquist, *J.*, dissenting).  Some scholars have argued that the omission of the right to a jury trial from the original Constitution was the reason "the entire issue of the absence of a bill of rights was precipitated at the Philadelphia Convention."  Charles W. Wolfram, *The Constitutional History of the Seventh Amendment*, 57 Minn. L. Rev. 639, 657 (1973).

For this reason, both the Supreme Court and our Court have ensured that questions the Constitution reserves to juries are actually decided by them. In a long line of cases, the Supreme Court has taught that where a case presents both legal and equitable issues, the legal issues should generally be tried first, before a jury. *See, e.g.*, *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510-11 (1959); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962); *Ross v. Bernhard*, 396 U.S. 531, 540 (1970). These holdings guarantee that in mixed cases, "the jury's findings on the issues of fact common to both the equitable and legal claims . . . bind the judge in the equitable action," rather than the reverse. Margaret L. Moses, *What the Jury Must Hear: The Supreme Court's Evolving Seventh Amendment Jurisprudence*, 68 Geo. Wash. L. Rev. 183, 208 (2000). For our part, we have confirmed that "[w]hen an action involves both legal and equitable claims that have common issues of fact, and a jury trial has been properly demanded with regard to the legal claims, the parties have a right under the Seventh Amendment to have the legal claims tried to a jury." *Wade v. Orange Cnty. Sheriff's Off.*, 844 F.2d 951, 954 (2d Cir. 1988) (citing *Dairy Queen*, *Beacon Theatres*, and *Ross*).

The majority holds that the district court did not violate Clark's Seventh Amendment right to a jury trial because "the factual issues relevant to

16

Clark's equitable tolling claim and her § 1983 claims are analytically and temporally distinct." *Ante*, at 49. I disagree because the district court made factual findings about at least one issue -- the severity of Hanley's abuse -- that is common to Clark's equitable tolling and Section 1983 claims.

The Complaint asserts two Section 1983 claims for violations of her Eighth Amendment right to be free of "cruel and unusual punishments." U.S. Const., amend. VIII. Clark brings the first of her claims against Hanley alone, alleging he assaulted her on at least four occasions and the assaults "served no cognizable or conceivable penological purpose." App'x 125. She brings her second claim against the MacDougall-Walker Defendants, alleging they were deliberately indifferent to the risk Hanley posed to her safety. *Id.* at 126-27. To maintain each of her claims, Clark bears the burden of demonstrating that Hanley's abuse was of constitutional magnitude.

I begin with Clark's claim against Hanley. In *Boddie v. Schnieder*, 105 F.3d 857, 860-61 (2d Cir. 1997), we held that "sexual abuse of a prisoner by a corrections officer may in some circumstances violate the prisoner's right to be free from cruel and unusual punishment." A prisoner may maintain a Section 1983 claim for sexual abuse suffered while incarcerated "when two requirements

17

are met.  First, the alleged 'punishment' must be, 'objectively, sufficiently serious.'

Under the objective standard, 'conditions that cannot be said to be cruel and

unusual under contemporary standards are not unconstitutional.'"  *Id.* at 861

(first quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), then quoting *Rhodes v.*

*Chapman*, 452 U.S. 337, 347 (1981)).  Sexual abuse of a prisoner by a corrections

officer can rise to the level of a constitutional violation if it is "severe,"

"repetitive," or "cumulatively egregious."  *Id.*  But "isolated episodes of

harassment and touching," even if "despicable" or actionable under state tort law,

"do not involve a harm of federal constitutional proportions."  *Id.* at 861-62 (citing

*Farmer*, 511 U.S. at 833-34; *Rhodes*, 452 U.S. at 348-49).

As with other Eighth Amendment claims, "contemporary standards

of decency" evolve over time and, thereby, "mark the progress of a maturing

society."  *Crawford v. Cuomo*, 796 F.3d 252, 259 (2d Cir. 2015); *see also Roper v.*

*Simmons*, 543 U.S. 551, 564 (2005) (noting that contemporary standards emerge

out of "objective indicia of consensus, as expressed in particular by the

enactments of legislatures that have addressed the question").  In the past

quarter-century, Congress, state legislatures, and courts have all acknowledged

that "deep moral indignation . . . has replaced what had been society's passive

18

acceptance of the problem of sexual abuse in prison." *Crawford*, 796 F.3d at 259-60 (cataloguing federal and state statutes). Connecticut recognized the severity of the issue earlier than many other States, enacting in 1975 a statute criminalizing "sexual contact" between a person "in custody of law or detained in a hospital or other institution" and a perpetrator who "has supervisory or disciplinary authority over such other person." 1975 Conn. Acts 983 (Reg. Sess.). This is the crime to which Hanley pleaded guilty and for which he served a term of imprisonment and was required to register as a sex offender.

In addition to making this objective showing, a plaintiff must also satisfy a subjective standard: She must demonstrate that "the prison official involved must have a 'sufficiently culpable state of mind.'" *Boddie*, 105 F.3d at 861 (quoting *Farmer*, 511 U.S. at 834).

Like her claim against Hanley, Clark's claim against the MacDougall-Walker Defendants includes both objective and subjective elements. Where a prisoner's Section 1983 claim is for prison officials' deliberate indifference to a corrections officer's sexual misconduct, the objective standard is whether the prisoner "is incarcerated under conditions posing a substantial risk of serious harm," *Morgan v. Dzurenda*, 956 F.3d 84, 89 (2d Cir. 2020) (quoting

19

*Farmer*, 511 U.S. at 834).  The subjective test is the same as above, that is, the

defendant officials "must have a 'sufficiently culpable state of mind.'"  *Farmer*, 511

U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

Both of Clark's claims, therefore, require her to show that Hanley's

abuse -- or, as to the MacDougall-Walker Defendants, the risk of abuse Hanley

presented -- was, objectively and subjectively, serious enough as to violate the

Eighth Amendment.  Our cases make clear that these are questions of fact that do

not always have self-evident answers and depend on value judgments about the

moral standards of the community.  For instance, in *Crawford* we observed that

"as the basic mores of society change[,] . . . conduct that might not have been seen

to rise to the severity of an Eighth Amendment violation 18 years ago may now

violate community standards of decency."  796 F.3d at 260.[5]

These are, quintessentially, questions for a jury -- even more so

because the plight of transgender prisoners is an issue as to which social mores

are changing quickly and dramatically.  Courts both in this Circuit and elsewhere

have recently permitted transgender prisoners' Section 1983 claims to survive

---

[5]     Indeed, in *Crawford* we specifically held that "the officer's conduct in *Boddie*," which we had decided was not of constitutional magnitude, "would flunk its own test today."  *Id.*

motions to dismiss, sometimes even where prison officials' sexually harassing conduct was purely verbal.  In *Johnson v. Cook*, No. 19 Civ. 1464, 2021 WL 2741723, at *10 (D. Conn. July 1, 2021), the plaintiff alleged that officers at a facility where Clark was temporarily housed "made demeaning and derogatory comments about [the plaintiff's] gender transition and voiced transgender-phobic slurs about her in front of the other inmates at her dining table."  Because the plaintiff alleged she had "experienced an 'appreciable injury'" as a result of the harassment, the court declined to dismiss her Eighth Amendment claim.  *Id.* (quoting *Willey v. Kirkpatrick*, 801 F.3d 51, 70 (2d Cir. 2015)); *see also B. Braxton/Obed-Edom v. City of New York*, 368 F. Supp. 3d 729, 737-38 (S.D.N.Y. 2019) (denying motion to dismiss transgender prisoner's failure-to-protect claim); *Stroud v. Pruitt*, No. 17 Civ. 1659, 2019 WL 2077028, at *5 (E.D. Cal. May 10, 2019) (recommending dismissal of transgender prisoner's claims of verbal harassment but not her claims of physical abuse).  *But see Fisher v. Worth*, No. 18 Civ. 16793, 2022 WL 3500432 (D.N.J. Aug. 18, 2022); *Outman v. Superintendent, Five Points Corr. Facility*, No. 16 Civ. 788, 2017 WL 318852 (N.D.N.Y. Jan. 23, 2017) (both declining to equitably toll statutes of limitations for transgender inmates).

Whether Hanley's abuse was of constitutional magnitude overlaps with whether Clark is entitled to equitable tolling. As no party contests, the severity and sequelae of Hanley's abuse are central to Clark's claim for equitable tolling. The first element of that claim is that "a petitioner must demonstrate 'extraordinary circumstances beyond [her] control' that prevented [her] from timely filing [her] petition." *Harper v. Ercole*, 648 F.3d at 137 (quoting *Baldayaque v. United States*, 338 F.3d 145, 151 (2d Cir. 2003)). Whether a circumstance is "extraordinary" does not have to do with "the uniqueness of a party's circumstances" but, rather, "the severity of the obstacle impeding compliance with a limitations period." *Id.* The second element of a claim for equitable tolling is that the petitioner "must demonstrate that '[s]he acted with reasonable diligence throughout the period [s]he seeks to toll.'" *Id.* at 138 (quoting *Belot v. Burge*, 490 F.3d 201, 205 (2d Cir. 2007)). The standard is whether the petitioner "acted as diligently as reasonably could have been expected *under the circumstances*," not whether she demonstrated "maximum feasible diligence." *Id.* (alteration adopted and internal quotation marks omitted).

Thus, when the district court concluded that Hanley's assaults "were not physically coercive or made under threat of harm or retaliation" and that

22

"[t]hey were unlike a violent sexual assault or rape that would likely result in the most severe type of psychological trauma," *Clark*, 2022 WL 124298, at *6, the district court found facts that were common to Clark's claim for equitable tolling and Clark's underlying Section 1983 claims. The district court ventured improperly into the province of the jury because its characterization of the abuse Clark experienced could, under principles of collateral estoppel, have precluded the jury from determining that Clark's injuries -- and the risk Hanley posed to her -- were of constitutional magnitude or that they could have prevented her from bringing suit for four years. That the district court did not find Clark suffered *no* harm is not relevant to this analysis. First, no party denies that Hanley repeatedly assaulted Clark. Second, the overlap between the elements of Clark's Eighth Amendment claims and her claim for equitable tolling has to do with the *magnitude* of the harm she suffered, not the fact that she suffered any harm at all.[6]

---

[6]     The majority writes that a jury would determine "*how much* money would compensate Clark" for the harm she suffered, an inquiry "distinct" from the equitable tolling inquiry, which requires assessing "*whether* the harm *caused* her to miss the filing deadline." *Ante,* at 50-51. But part of the inquiry into whether the harm *caused* Clark to miss the deadline turns on the *severity* of the harm, which would be an obvious factor in the jury's determination of the amount of compensatory damages. Both inquiries implicate the Eighth Amendment. By concluding that Clark's harm was not so severe as to warrant equitable tolling, the district court intruded into the province of the jury.

The district court's error in making factual findings that the Seventh Amendment reserves to the jury is, in my view, sufficient reason for this Court to vacate and remand the judgment of the district court. The district court's discussion of the severity of Clark's harm ignores the extent to which a sexual assault survivor may suffer and supports that testimony from a qualified individual would have been proper in making such a determination. It also underpins the district court's assessment that the fact Clark filed a state habeas petition -- which had nothing to do with Hanley's assaults, the conditions of Clark's confinement, or her transgender status -- shows she could have also brought *this* claim earlier, *see id*.

It is noteworthy that the district court's opinion contains no reference to the Seventh Amendment. The MacDougall-Walker Defendants argue that the guarantee of a jury trial is inapplicable to Clark's case because the "Seventh Amendment does not extend" to "threshold issues that courts must address to determine whether litigation is being conducted in the right forum at the right time." Appellees' Br. at 34 (alteration adopted) (internal quotation marks omitted). For this proposition, the MacDougall-Walker Defendants cite -- but misapprehend -- our decision in *Messa v. Goord*, 652 F.3d 305, 309 (2d Cir.

24

2011).  In *Messa*, we held that statutes of limitations are not "threshold issues" like the exhaustion of administrative remedies.  *Id.* (noting that while "the two are similar in some ways -- *e.g.*, both are non-jurisdictional affirmative defenses -- they serve very different functions in our civil justice system").

In sum, the district court made factual findings that, under the Constitution, were not for it to make -- and, then, to Clark's disadvantage, allowed those findings to pervade its legal reasoning.

III.

Clark's allegations as to her difficulties in bringing this case are not unique.  The amicus briefs filed in the district court as well as this Court depict the grim realities that are the daily fare of transgender prisoners.  An empirical study published in 2011 reported that nearly two in five transgender people who are incarcerated report being sexually victimized; close to half of those prisoners identify police or corrections officers as their perpetrators.  Brief of *Amici Curiae* Lambda Legal Defense and Education Fund, Inc., Amicus Project at UConn Law, Just Detention International, and Center for Constitutional Rights ("Amicus Br."), at 5.  And "[o]nce targeted for abuse, the majority of transgender survivors are subjected to repeated sexual assaults," as Clark was.  *Id.* at 6 n.9 (quoting Just

25

Detention International, *Targets for Abuse: Transgender Inmates and Prison Rape* 2 (2013)).  Like Clark, many transgender inmates do not disclose their gender identity, "fearing [they] will be at greater risk of sexual assault" if they do.  *Stroud v Pruitt*, 2019 WL 2077028, at *2.

As a general matter, it is well-established that victims of sexual misconduct often delay reporting.  *See, e.g.*, *United States v. Weisinger*, 586 F. App'x 733, 737-38 (2d Cir. 2014) (summary order) (noting that expert testimony "that delayed reporting was not inconsistent with abuse" was "supported by empirical, peer-reviewed research, well accepted in the courts"); *see also Fuentes v. T. Griffin*, 829 F.3d 233, 239 (2d Cir. 2016) (recounting expert testimony that "a recognizable pattern of behavior that is exhibited by victims of sexual assault . . . may include delayed reporting" (citations and internal quotation marks omitted)).  In this respect, prisons in particular present a "unique psychological environment," *Stone #1 v. Annucci*, No. 20 Civ. 1326, 2021 WL 4463033, at *12 (S.D.N.Y. Sept. 28, 2021), in which "the specter of retaliation [is] a real and ever-present force in an inmate's life," *Davis v. Jackson*, No. 15 Civ. 5359, 2016 WL 5720811, at *11 (S.D.N.Y. Sept. 30, 2016).  *See also*, *e.g.*, James E. Robertson, *"One of the Dirty Secrets of American Corrections": Retaliation, Surplus Power, and*

26

*Whistleblowing Inmates*, 42 U. Mich. J.L. Reform 611, 614 (2009) (noting that "[i]nmates' fear of retaliation deters them from filing grievances," yet the failure to file timely often limits a prisoner's capacity to seek redress).

Because the prison environment is more threatening for those who are transgender, when transgender prisoners report mistreatment, more than half of them report facing "retaliation in the form of punitive transfer, isolation, neglect, or further abuse." Amicus Br. at 16. Moreover, "transgender prisoners experience secondary victimization when their reports of abuse are ignored or disbelieved." *Id.* (quoting Julia C. Oparah, *Feminism and the (Trans)gender Entrapment of Gender Nonconforming Prisoners*, 18 U.C.L.A. Women's L.J. 239, 263 (2012)).

Clark's allegations and her testimony at the evidentiary hearing track these findings closely: She was repeatedly abused by a corrections official who took advantage of prison policies to isolate and assault her. She was mocked by officials -- including some who were friendly with her assailant -- who called her "gross," "nasty," "disgusting," and a "fag[g]ot" for being another man's victim. App'x 123, 375. Her fellow prisoners ridiculed the assaults as "gay stuff" -- a phrase that very likely heightened Clark's already intense shame about

27

her gender dysphoria. Between 2011 and early 2016, she reported Hanley's abuse only once, and even then reluctantly: She told the district court "I didn't want to go" to the interview at which she disclosed what Hanley did to her because "I was afraid of what would happen with the staff." *Id.* at 366. Although authorities believed Clark's report and took appropriate action, in the ensuing years Clark's fear prevented her from speaking up further. She lacked access to medical and mental health care for her gender dysphoria, to the point that she partially castrated herself and was repeatedly hospitalized out of concern she would die by suicide.

Whether Clark can prove her allegations, whether Hanley's abuse was "sufficiently serious," *Farmer*, 511 U.S. at 834, and whether the danger to which the MacDougall-Walker Defendants exposed Clark constituted a "substantial risk of serious harm," *id.*, are all questions for a jury. For the reasons discussed above, I would hold that the Seventh Amendment guarantees Clark the right to have these questions answered by a jury -- not by a judge presiding over a highly circumscribed evidentiary hearing scheduled on short notice. And I would hold that the district court further abused its discretion by evaluating Clark's testimony based on a limited record, without permitting Clark's counsel

28

to conduct discovery into other categories of evidence bearing on Clark's claim for equitable tolling.

"Statutes of limitations are generally subject to equitable tolling where necessary to prevent unfairness to a plaintiff who is not at fault for her lateness in filing." *Gonzalez v. Hasty*, 651 F.3d 318, 322 (2d Cir. 2011) (quoting *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 322 (2d Cir. 2004)). Because Clark was not provided with a full and fair opportunity to show that she was "not at fault for her lateness in filing," and because the district court decided questions that should have been put to a jury, I would vacate the judgment and remand for further proceedings. Accordingly, I respectfully dissent.